**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

UNITED STATES OF AMERICA          :
                                  :
         v.                       :
                                  :    Criminal Indictment No.
TODD CHRISLEY,                    :
JULIE CHRISLEY, and              :    1:19-CR-297-ELR-JSA
PETER TARANTINO,                 :
                                  :
         Defendants.             :

**DEFENDANTS TODD CHRISLEY AND JULIE CHRISLEY'S POST
HEARING BRIEF IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE
SEIZED PURSUANT TO SEARCH WARRANTS EXECUTED AT 4125
WELCOME ALL ROAD AND 1800 CENTURY BOULEVARD NE**

## I.    INTRODUCTION

In 2017, the Georgia Department of Revenue ("GDOR") conducted two

warrantless, unconstitutional[1] searches and seizures of warehouses rented by

Defendants Todd and Julie Chrisley ("the Chrisleys"). These seizures were part of

GDOR's ongoing joint criminal and civil investigation of the Chrisleys that began

in 2014. By early 2017, and prior to the seizures, GDOR was sharing its

---

[1] The United States of America ("Government") concedes the searches at issue were unconstitutional and the Chrisleys have standing to challenge the seizures. *See* Transcript I, 86:16-87:11; *see also* May 10, 2021 email from Thomas Krepp, attached as **Exhibit A**.

1

investigative information with civil and criminal agents of the Internal Revenue Services ("IRS") as part of a joint GDOR/IRS investigation of the Chrisleys.

GDOR always intended to seek IRS involvement in, and to assist the IRS in, the criminal investigation and prosecution of the Chrisleys; and that is what happened. In its illegal searches of the Chrisleys' warehouses, allegedly to seize property to pay a tax lien,[2] GDOR seized 20 boxes of documents[3] that could not possibly have been related to a tax lien sale. GDOR shared information in these illegally obtained documents with IRS criminal investigators prior to the IRS's 2017 investigation of the Chrisleys. GDOR turned these documents over to the IRS after a January 2018 joint GDOR/IRS/FBI/AUSA meeting, during which the Government was informed the Chrisleys challenged the legality of the seizures. The United States Supreme Court held long ago in *Elkins v. U.S.*, 364 U.S. 206 (1960), that the

---

[2] GDOR never sold any of the Chrisleys' seized property to cure any alleged tax deficiency, but returned virtually all the property to the Chrisleys. *See* Transcript I, 206:12-206:19. The only items GDOR and the Government kept are the documents at issue here, which the Government says relate to the Chrisleys' alleged financial and tax crimes. This shows the focus of the seizures was securing documents to aid the Government's prosecution of the Chrisleys, not curing any tax deficiency.

[3] The Government contends the boxes of documents it intends to use at trial were seized as a result of GDOR's raid of Printers and Parts Warehouse ("PPW"). The chain of custody of these boxes is nonexistent, as they were not accounted for on any inventory of the PPW seizure, and GDOR cannot definitively say where the boxes came from. *See* T-I at 176-177; Def. Ex 36. For present purposes, it is assumed the boxes came from PPW.

Government cannot use evidence unconstitutionally seized by a state agency that it received from the state agency.

In an effort to justify its receipt of the illegally obtained documents from GDOR, therefore, the Government sought and obtained search warrants to GDOR. The Government's warrants do not validate or justify GDOR's prior illegal searches and seizures, and the documents still must be excluded. The testimony and evidence presented at the suppression hearing, overwhelmingly requires suppression of the unconstitutionally seized documents. The Government cannot meet its burden of proving otherwise.

The Government nevertheless contends the exclusionary rule does not apply because (1) GDOR's civil team seized the evidence and (2) the Government acted in good faith. These contentions are without merit because GDOR was criminally investigating the Chrisleys at the time of the warrantless seizures, GDOR intended to provide the unconstitutionally seized information to the Government to aid its criminal prosecution of the Chrisleys, and GDOR worked hand-in-hand with the Government in doing so as reflected by the evidence.

10230505.4

## II.    FACTUAL BACKGROUND

### A.    GDOR's Investigation and Seizure Had a Criminal Purpose

#### 1.    GDOR's Investigation Was Criminal in Nature

GDOR's investigation into the Chrisleys had a pointedly criminal focus, even if it also had a civil collection component. The fact the Chrisleys were targeted by GDOR's criminal unit was evidenced by the dartboard then-GDOR Office of Special Investigations ("OSI") Criminal Chief Joshua Waites kept in his office with Todd Chrisley's face affixed to it. *See* T-I[4] at 201:4-12.  Waites and his OSI team were significantly involved in the GDOR investigation, and Waites directed much of it. The Government claims GDOR's investigation was purely civil in nature and was conducted solely by GDOR employee Katie Colvin Vancil, but the facts do not support this.  Indeed, Vancil admitted she was acting as Waites's "puppet" during the Chrisley investigation. *See* T-I at 143:9-12.

In 2014, Waites[5] directed Vancil to investigate the Chrisleys for tax-related issues. *See* T-I 123:17-124:10. Vancil did so, but suspended her investigation

---

[4] References herein to hearing transcript volumes I and II are cited as "T-I" and "T-II" respectively.

[5] Waites was terminated from GDOR after it was discovered he lied on an official government form and he maintained a "slush fund" at GDOR, and he is currently under criminal investigation. *See* March 15, 2020 Georgia Inspector General's Office Release, https://oig.georgia.gov/press-releases/2020-03-15/revenue-

pending resolution of Todd Chrisley's bankruptcy. *See id*. at 126:13-127:1.  Once the bankruptcy resolved, Waites again directed Vancil to investigate the Chrisleys for tax and other financial related issues.  *See id*. at 127:2-8.  Waites also began an investigation into the Chrisleys for possible tax-related crimes. *See id.* at 127:9-128:1; *see also* Def. Ex. 3. Waites and his criminal OSI team, including LaShaun Wright ("Wright"), remained heavily involved in the investigation and directed and received regular updates from Vancil.  *See* T-I at 153:15-154:10; T-II at 130:21-131:6.

On December 6, 2016, Waites arranged a December 19, 2016 meeting among OSI, Vancil, and WSB-TV to discuss the Chrisleys, which resulted in a WSB-TV feature on the Chrisleys' tax situation. *See id*. at 128:16-129:10; T-II at 36:5-17; *see also* Def. Ex. 7.  It is reasonable to infer GDOR planted the WSB-TV story to further its campaign against the Chrisleys.  IRS Agent Larry Arrow testified his criminal investigation of the Chrisleys was predicated on GDOR information and these planted "news" reports.  *See* T-II at 50:8-17.

---

investigations-director-terminated-after-oig-investigation.   At   the   suppression hearing the Government's lead prosecutor stated, "we think it's appropriate for the court to advise Josh Waites of his [Fifth Amendment] rights if he's called." T-I at 243:23-25.

In 2016 and early 2017, members of GDOR's criminal OSI unit, including Wright and Valencia Jacobs, obtained information about the Chrisleys from the Georgia Crimes Information Center ("GCIC") database and the GENTEX system (at Waites's instruction).  *See* T-II at 104:2-22; 106:2-11; 115:18-116:5; 122:13-18; 121:14-16; Def. Ex. 3 (OSI Agent Amy Doherty accessing account in February 2016); Def. Ex. 40 (GCIC Emails).[6]  On February 7, 2017, Vancil contacted the IRS to provide the IRS with information GDOR had collected regarding the Chrisleys and to initiate a "joint agency investigation" into the Chrisleys.  *See* Def. Ex. 9.  On February 15, 2017, Waites, Vancil, and other GDOR personnel met to discuss the Chrisleys, and OSI agents Waites and Brian Crisp formally opened a criminal case against the Chrisleys, which remained open until December 2017.  *See* T-I at 140:1-6; Govt. Exs. 200, 226.  On February 19, 2017, Vancil, Waites, and GDOR lawyer Merrill Jacobson had a Skype call with Kyle Chrisley and his then-wife, Alexus Chrisley, during which Waites fed questions to Vancil dealing in part with alleged illegal offshore accounts controlled by the Chrisleys.  *See* T-I at 153:15-154:10.[7]

---

[6] GCIC searches made for illegitimate purposes are subject to criminal penalties. *See* O.C.G.A. § 35-3-38. The civil side of GDOR has never shown any legitimate purpose for its GCIC searches regarding the Chrisleys.

[7] There is no evidence the Chrisleys maintained any "offshore accounts."

On February 20, 2017, Waites instructed Vancil to fill out and submit a Form 314(a) to the U.S. Department of Treasury's Financial Crimes Enforcement Network ("FINCEN") to obtain the Chrisleys' confidential financial and banking information, which Vancil did. *See id*. at 140:7-20; 142:10-12. To secure information from the FINCEN database, the requesting party must attest they are investigating either <u>criminal</u> money laundering or terrorism. *See* Govt. Ex. 226. Vancil, who typically led civil tax collection matters, only utilized the FINCEN process once in her entire career – the investigation into the Chrisleys. *See id*. at 140:8-141:2; Govt. Ex. 226. Vancil initially attested on the FINCEN Form 314(a) that she was investigating the Chrisleys for criminal tax evasion. *See id*. at 142:10-12. OSI agent Scott Santillie later changed Vancil's attestation to state GDOR was investigating the Chrisleys for criminal money laundering. *See id*. at 142:10-17. These attestations demonstrate GDOR was conducting a ***criminal*** investigation of the Chrisleys.

FINCEN sent the Chrisleys' confidential financial information to Santillie who sent it to Vancil. *See* Def. Ex. 14. After Vancil reviewed the FINCEN documents, she subpoenaed financial institutions associated with the Chrisleys disclosed in the FINCEN response. *See* Def. Exs. 16, 17, 19, 27, 28, 29, 30, 31, 32; T-I at 145:17-146:6. Among other things, Vancil used information from the

7

FINCEN response to identify Printers and Parts Warehouse ("PPW"), where the illegal seizure of the Chrisleys' documents occurred.

From March 1 to March 7, 2017, Waites and Vancil exchanged text messages regarding the potential seizure of the Chrisleys' property, and Waites personally served the Chrisleys with GDOR lien notices at their home in Nashville, Tennessee. *See* Def. Ex. 18; T-I at 160:4-21.[8]  On March, 7, 2017, GDOR attempted to seize the Chrisleys' assets through a warrantless search of another storage facility.  *See* T-I at 161:7-162:6; Def. Ex. 25.  On March 28 and 29, 2017, Vancil, Waites, Crisp, and other GDOR agents conducted the illegal and warrantless search and seizure at the PPW warehouse. *See* T-I at 119:19-25, 172:22-173:12. Waites arrived at PPW with his vehicle's blue lights and siren activated – but he instructed GDOR agents to lie and say he was never there.  *See id*. at 173:13-20.

The criminal nature of the PPW seizure is further evidenced by the testimony of the owner of PPW, who testified that "when I told them I was going to call the police because I felt like I was being attacked, [Waites] told me he was the police and if I didn't cooperate he was going – he was going to put me in handcuffs and

---

[8] Vancil claims she learned prior to the seizure that the Chrisleys were auctioning items in the PPW to pay off their post-bankruptcy IRS obligations. *See* Def. Ex. 18; T-I at 156:6-13.  This admission directly refutes the Government's allegations in Count Ten of the Indictment that the Chrisleys intentionally hid assets to ***avoid*** their 2009 post-bankruptcy tax obligations.

take me to jail." *Id*. at 38:9-21. GDOR took everything of the Chrisleys' at the warehouse – including boxes of worthless financial documents – that Vancil admitted was unusual for GDOR to do. *See* id. at 173:23-174:25.

Following the PPW seizure, Waites, Wright, Vancil, and others in OSI continued to investigate the Chrisleys, including through GCIC.[9] *See* Def. Ex. 40. Waites continued to instruct Vancil and request specific information regarding the Chrisley investigation. *See* Def. Ex. 18. OSI agent LaShaun Wright repeatedly asked for updates on the investigation, including when it would be turned over to her. *See id*. at 130:21-131:6. Vancil dutifully kept her updated. *See id*.

The foregoing shows GDOR was engaged in a criminal investigation of the Chrisleys. The Government's contention that GDOR was simply seeking to collect back taxes through civil enforcement is directly contradicted by the evidence and testimony.[10]

---

[9] After the PPW seizure, Vancil and members of the OSI team, including Brian Crisp, conducted a warrantless search and seizure of the Chrisleys' unit at a Cube Smart storage facility, which Crisp illegally broke into using a hack saw. *See* T-I at 137:24-138:4, 168:19-169:2.

[10] Attached as **Exhibit B** is a chart showing a far greater number of GDOR criminal investigators than civil investigators worked on the Chrisley matter.

2.    GDOR Always Intended to Aid the Government

GDOR always intended its investigation would result in the Government's criminal prosecution of the Chrisleys. Wright testified that, when GDOR works with and provides information regarding a taxpayer's suspected wrongdoing to the Government, as it did with regard to the Chrisleys, it is to enable the Government to bring criminal charges against the taxpayer and GDOR to recoup funds resulting from the federal criminal prosecution. *See* T-II at 116:17-23, 117:3-4. Wright admitted to providing evidence of GDOR's investigation into the Chrisleys to IRS Agent Arrow to accomplish these very goals. *See id*. at 109:4-13.

Vancil's testimony and supporting documents further prove this. Vancil's communications to the IRS on February 6, 2017, evidences Vancil's intent to create a "joint [GDOR/IRS] investigation" into the Chrisleys and provide information from that investigation to the Government. Def. Ex. 9. The next day and thereafter, including at a meeting on March 9, 2017, Vancil shared information with the IRS on the Chrisley investigation. *See* Def. Exs. 9, 21; T-I at 135:4-6; 156:25-157:21; 158:21-159:11; 171:15-17.

IRS Agent Betty Carter admitted GDOR provided the IRS "a lot" of information on the Chrisleys at the March 9, 2017 meeting. *See* T-II at 90:21-91:18. Vancil notified Carter of the PPW warehouse search and seizure before it occurred

10

10230505.4

and, afterwards, of what GDOR had found.  *See* Def. Ex. 21; T-II at 92:20-25.  It is

clear GDOR's goal was at least in part to assist the Government with its investigation

of the Chrisleys and, "if all goes well" (in Wright's words), in bringing criminal

charges against the Chrisleys.  T-II at 116:21-23.

**B.**  **GDOR and the Government Were Engaged in a Joint Investigation at the Time of the Illegal Searches and Seizures**

The evidence and testimony establish GDOR was working with the IRS in a

joint criminal investigation of the Chrisleys before, during, and after the PPW

seizure on March 28 and 29, 2017.

In addition, while GDOR's Vancil and IRS's Carter were actively working

together in February and March 2017 as outlined above, OSI agent Wright and IRS

agent Larry Arrow began working the Chrisley matter together.  *See* T-II 116:6-13.

Wright regularly worked joint investigations with Arrow to enable the IRS to bring

federal criminal charges against a taxpayer, and this was the purpose of her work

with Arrow on the Chrisley matter. *See id*. at 109:4-13, 116:17-117:4.  Wright

admitted Arrow asked her for information on the Chrisleys (*see id*.), admitted she

provided Arrow with that information (*see id*. at 122:19-21; 123:14-16), and agreed

she most likely shared information with Arrow in early 2017, prior to the seizure.

*See id*. at 127:24-128:4.

11

Records of communications between Arrow and Wright corroborate Wright's testimony and show that, beginning in December 2016, Arrow and Wright exchanged a total of 118 calls, 109 of which occurred during the Chrisley investigation.[11]  *See* Def. Exs. 53, 54.  They had no calls before August 2016, and only nine calls after the IRS issued search warrants to GDOR in February 2018 to retrieve the illegally seized documents.  *Id.*  Wright and Arrow's calls line up exactly with key events in the Chrisley investigation. This is no coincidence.

For example, Wright and Arrow spoke the day after the December 6, 2016, meeting among Waites, others at GDOR, and WSB-TV regarding the Chrisleys.  *See* Def. Ex. 7, Ex. 54 at 32.   Wright and Arrow spoke immediately before and immediately after the WSB-TV story aired on February 6, 2017.  *See* Def. Ex. 53, p. 1.  On February 23, 2017, Wright and Arrow spoke some 30 minutes after Wright accessed the Chrisleys' tax data in GENTEX.  *See* Def. Ex. 3 at 31, Ex. 53 at 4. Wright and Arrow exchanged multiple text messages on March 9, 2017, just an hour before GDOR and the IRS met regarding the Chrisley case.  *See* Def. Ex. 53 at 6. And, Wright and Arrow spoke on April 20, 2017, just ***one minute*** after Arrow

---

[11] The Government suggests the Chrisleys "cherry picked" these calls.  But all these calls occurred during the Chrisley investigation and ceased once GDOR's role in the criminal investigation was over and the Government took possession of the documents at issue.

reached out to Vancil about the Chrisley matter. *See* Def. Ex. 54 at 46; Govt. Ex. 104.

After the PPW seizure, but *before* Vancil had reviewed in detail all the documents seized, Arrow contacted Vancil about their contents. *See* T-I at 169:8-12. Vancil knew Wright was passing information to Arrow about the seizure and GDOR's investigation. *See id.* at 169:13-18. Vancil believed Waites also was passing information to Arrow about GDOR's Chrisley investigation. *See id.* at 169:19-170:8. Vancil essentially admitted she completed her review of the documents only after Arrow demanded to know what GDOR had seized. *See id.* at 187:20-188:3 (GDOR began going through financial statements on May 19, 2017); 184:16-18 (Arrow was demanding everything from Vancil in April 2017).

Certain people within GDOR were concerned about the information-sharing between the IRS and GDOR. *See id.* at 184:19-185:4. GDOR lawyer Jacobson worried GDOR had improperly shared information on the Chrisley case with the IRS, and Jacobson "ripped into Josh [Waites]" for improperly sharing that information. *See id.* at 199:1-10. Vancil agreed that because of issues with GDOR being "manipulated" by the criminal OSI, and because of GDOR's improper sharing of information with the IRS, GDOR employees would lie to avoid getting in trouble. *See id.* at 200:3-8.

GDOR and the IRS were working hand-in-hand to build a prosecution against the Chrisleys prior to the PPW seizure and thereafter. Arrow began investigating the Chrisleys on March 24, 2017. *See* Govt. Ex. 102. On March 28, 2017, the first day of the PPW seizure, Arrow's section head asked him the status of his Chrisley investigation. *See id*. On April 20, 2017, Arrow emailed Vancil to request information on the Chrisley case. *See* Govt. Ex. 104. One minute later, Wright and Arrow spoke again. *See* Def. Ex. 54, p. 46. On April 21, 2017, after these conversations with the GDOR, Arrow submitted his preliminary investigative report into the Chrisleys. *See* Govt. Ex. 105. Arrow's report admits his investigation was "based on information received from the local news as well as [GDOR]." *Id.*

Despite the fact that IRS Agent Carter had been involved with GDOR in the Chrisley investigation since February 2017, and IRS Agent Arrow since December 2016, Carter only "officially" referred the case to the IRS criminal investigation unit, with information she had obtained from GDOR, on July 7, 2017. *See* Govt. Ex. 108; T-II at 92:7-10. By this time, the Government's investigation was well underway, and the IRS and GDOR had been working together for at least eight months.

On January 4, 2018, GDOR and the Government met to discuss the Chrisley case and the fact the Chrisleys were challenging GDOR's seizures. *See* T-II 54:16-55:1. On February 1, 2018, the Government sought search warrants for the

documents GDOR illegally seized from the PPW warehouse, and executed the warrants a week later. *See* Govt. Ex. 118. The only reason the warrants appear to have been sought was the Government's attempt to sanctify GDOR's illegal seizure of the documents upon which the Government now relies.

## III.  ARGUMENT AND CITATION TO AUTHORITY

The Government concedes GDOR's search and seizure of the Chrisleys' property at PPW violated the Chrisleys' Fourth Amendment rights and that the Chrisleys have standing to challenge GDOR's unconstitutional seizures. The only issue before the Court, therefore, is whether the illegally seized documents should be suppressed.

The exclusionary rule provides evidence seized as the result of a search that violates the Fourth Amendment may not be used by the Government in a criminal prosecution. *See U.S. v. Powell*, No. 2:17-CR-00021-RWS-JCF, 2018 WL 6706053, *3 (N.D. Ga. 2018). The rule "serves to deter police misconduct by preventing the introduction of evidence obtained through police illegality." *U.S. v. Virden*, 488 F.3d 1317, 1322 (11th Cir. 2007) (citing *Nix v. Williams*, 467 U.S. 431, 442-43 (1984)). "Without the rule, the constitutional protections against search and seizure are meaningless." *Id*. (citing *Terry v. Ohio*, 392 U.S. 1, 12 (1968)).

10230505.4

Once a Fourth Amendment violation is established, "the burden shifts to the government to demonstrate why the exclusionary rule should not apply to the fruits of the illegal search or seizure." *U.S. v. Runyan*, 275 F.3d 449, 456 (5th Cir. 2001); *see also U.S. v. Cray*, 450 Fed. Appx. 923, 930 (11th Cir. 2012) (once defendant establishes violation of Fourth Amendment, burden shifts to government to show evidence is nevertheless admissible). The exclusionary rule applies when (1) there is misconduct by law enforcement or their adjuncts; (2) application of the rule would result in appreciable deterrence of that misconduct; and (3) the benefits of the rule's application do not outweigh its costs. *See U.S. v. Herring*, 492 F.3d 1212, 1217 (11th Cir. 2007).

In determining whether the exclusionary rule applies to materials seized by a state agency and provided to federal law enforcement, the Court looks at the "offending officer's zone of primary interest" at the time of the seizure. *U.S. v. Janis*, 428 U.S. 433, 458 (1976) (finding exclusionary rule should not be applied in federal tax proceeding when state could not have envisioned its evidence being used in such proceeding). Where the seizing state officer intended to provide the seized materials to the federal government, as is the case here, the federal government cannot turn a blind eye to the state's illegal actions, and profit from such actions, by allowing the state to hand over the illegally seized evidence on a "silver platter."

16

*Elkins v. U.S.*, 364 U.S. 206 (1960) (excluding evidence illegally seized by state and handed over to federal government for use in federal proceeding). Evidence is also properly suppressed where the federal government works with a state agency on the investigation prior to the illegal seizure and then seeks to benefit from the illegally seized evidence. *See U.S. v. Cordero-Rosario,* 252 F. Supp. 3d 64, 79 (D.P.R., 2017). The federal government cannot subsequently sanitize such illegally seized evidence by presenting a warrant to the state agency that illegally seized it. *See id.*

Here, the evidence overwhelmingly shows GDOR was conducting a criminal investigation of the Chrisleys; GDOR provided the fruits of its investigation (including the illegally seized documents) to the Government to aid its criminal prosecution of the Chrisleys; and the Government was working with GDOR in a joint investigation of the Chrisleys prior to the seizure. The Government accordingly cannot show the fruits of the illegal PPW seizure should not be suppressed.

A.     **The Government Cannot Meet its Burden to Establish the Exclusionary Rule Does Not Apply**

1.     Law Enforcement Engaged in Misconduct During the Investigation and Seizure

"'[A]n assessment of the flagrancy of the police misconduct constitutes an important step in the calculus' of applying the exclusionary rule." *Herring v. U.S.*, 555 U.S. 135, 143 (2009) (quoting *U.S. v. Leon*, 468 U.S. 897, 911 (1984)). When

10230505.4

a law enforcement officer reasonably relies on an unknowingly invalid warrant, there is likely no police conduct to deter. *See Leon*, 468 U.S. at 908-09. Where an officer knowingly violates the Fourth Amendment rights of the defendant, however, that conduct should be deterred by excluding the tainted evidence. *See Herring*, 555 U.S. at 143; *Weeks v. U.S.*, 232 U.S. 383 (1914). In examining the seizing officer's intent and knowledge, the inquiry is an objective one and "not an inquiry into the arresting officers' subjective awareness." *Leon*, 468 U.S. at 922 n.23.

GDOR conducted warrantless searches of the Chrisleys' storage units and seized their property in knowing violation of the Chrisleys' Fourth Amendment rights. GDOR seized the documents at issue without a warrant or other legal authority—conduct that is objectively wrong. Further, Waites' instructions for GDOR to lie about his presence at the seizure shows that GDOR subjectively knew their conduct was wrong. Significantly, the Government ***concedes*** GDOR's misconduct was illegal and unconstitutional. The evidence further demonstrates the IRS was working with GDOR in a joint criminal investigation of the Chrisleys and that GDOR's efforts were intended to, and in fact did, aid and benefit the IRS.

Despite this, the Government contends it should be allowed to benefit from GDOR's illegal conduct by obtaining a search warrant to take from GDOR's possession the documents GDOR illegally seized. Issuing a warrant to obtain

18

previously illegally seized evidence, however, does not remove the taint of illegality, and the evidence must be excluded. *See U.S. v. McGough,* 412 F.3d 1232, 1240 (11th Cir. 2005) (warrant cannot be used retroactively to validate prior illegal search and seizure; where request for warrant is based not on "objectively reasonable law enforcement activity," but on prior unlawful and warrantless search, warrant affidavit is tainted and evidence must be excluded); *U.S. v. Hinton*, 113 F. Supp. 3d 1277, 1293 (N.D. Ga. 2015) ("If a search warrant is based on probable cause discovered because of an illegal search, generally the search warrant is tainted and the evidence obtained pursuant thereto is inadmissible.") (quoting *U.S. v. Zarabozo*, 378 Fed. Appx. 939, 940 (11th Cir. 2010)).

Further, GDOR's illegal actions are imputed to the Government. *See Preston v. U.S.*, 376 U.S. 364, 366 (1964) ("The question whether evidence obtained by state officers and used against a defendant in a federal trial was obtained by unreasonable search and seizure is to be judged as if the search and seizure had been made by federal officers."). GDOR intended to assist the Government in bringing criminal charges against the Chrisleys – Wright admits that, when she works a case with Arrow, including with regard to the Chrisleys, the goal is for the Government to bring criminal charges and GDOR to obtain restitution from the prosecution. *See* T-II at 116:21-23, 117:3-4. In addition, GDOR and the Government were working this

19

as a joint investigation, as Vancil requested, by communicating, exchanging information, and meeting regarding the seizures and how to proceed **before the seizures occurred**. *See* Def. Ex. 9; T-II at 90:21-91:3.

The documents at issue are the product of GDOR's misconduct (which the Government concedes), and the Government's subsequent warrant to GDOR does not validate and remove the taint of GDOR's misconduct. Indeed, GDOR's illegal conduct alone requires the documents at issue be suppressed as fruit of the poisonous tree. *See Wong Sun v. U.S.*, 371 U.S. 471 (1963).

2.    Suppressing the Evidence Will Result in Appreciable
      Deterrence of GDOR's and the Government's Misconduct

"According to the Eleventh Circuit, the purpose of the exclusionary rule is to deter unlawful police misconduct …." *U.S. v. Mobely*, No. 1:13-CR-218-CAP-LTW, 2015 WL 3488152, *2 (N.D. Ga. June 1, 2015) (quoting *U.S. v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002)). In *U.S. v. Tello-Lopez*, No. CR417-221, 2018 WL 3827404 (S.D. Ga. June 20, 2018), for instance, police officers entered and searched a murder suspect's home without a warrant, seized a firearm, and transported the suspect to the police station. While in custody, the suspect made incriminating statements, which he subsequently moved to suppress on the ground the initial search of his home and his arrest were without probable cause and thus illegal. The court agreed, finding that when the officers entered the home, "the

20

detectives embarked upon [an] expedition for evidence in the hope that something might turn up." 2018 WL 3827404 at *8 (quoting *Brown*, 422 U.S. at 605). The court reasoned, "[w]here the police misconduct has this 'quality of purposefulness,' the deterrence objectives of the exclusionary rule apply with special force. Therefore it is right and fitting to deny the police the fruit of their intentional misconduct." *Id.* (quoting *Brown*, 422 U.S. at 605). This is precisely what occurred here. GDOR targeted the Chrisleys and took everything from the warehouse "in the hope that something [related to their finances] might turn up" for use in future criminal prosecution.

Further, the deterrent purpose of the exclusionary rule justifies exclusion of evidence where "the particular challenged use of the evidence is one that the seizing officials were likely to have had an interest in at the time." *Tirado v. C.I.R.*, 689 F.2d 307, 311 (2nd Cir. 1982).[12] "If it is likely to occur to potential wrongdoers as they seize the challenged evidence to care about its use for the particular purpose later in issue, then removing the possibility of that use is likely to deter them from unlawful conduct." *Id.* at 310-11.

---

[12] *Tirado* sets forth a particularly instructive analysis of when the likelihood of deterrence justifies excluding evidence.

As shown above, GDOR was working with the IRS in a joint criminal investigation of the Chrisleys before, during, and after GDOR's illegal search and seizure at PPW, and GDOR always intended to provide the documents it seized to the IRS for a federal criminal prosecution. This close relationship between GDOR and the IRS is not limited to the Chrisleys' case; the evidence discussed above shows GDOR regularly works with and provides information regarding a taxpayer's suspected wrongdoing to the Government to enable the Government to bring criminal charges against the taxpayer and to provide restitution to GDOR from the federal criminal prosecution. GDOR finding alleged evidence of tax crimes and then handing the information over to the Government was thus squarely within GDOR's "zone of primary interest." *Janis*, 428 U.S. at 458. The likelihood of deterrence here is substantial, therefore, because exclusion of the documents in this case will deter GDOR's practice of conducting illegal searches and seizures of evidence to turn over to the IRS for criminal prosecution, as well as the IRS's practice of encouraging GDOR's illegality and receiving such evidence.[13]

---

[13] To the extent the Government contends GDOR was investigating jointly with the IRS's *civil* arm before the seizure, this is irrelevant. An IRS agent acts on behalf of the entire division – civil and criminal – because "agents are likely to have all the responsibilities of their agency in mind as they go about their investigations." *Tirado*, 689 F.2d at 312.

3.    The Deterrence Benefits of Applying the Exclusionary Rule Here Are Substantial

"[T]he deterrence benefits of exclusion 'vary with the culpability of the law enforcement conduct' at issue.  When the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Davis v. U.S.*, 564 U.S. 229, 238 (2011) (quoting *Herring*, 555 U.S. at 143, 144).

As shown above, GDOR acted deliberately in its investigation of the Chrisleys, its searches and seizures of their property, and the resulting violations of their Fourth Amendment rights.  Excluding the fruits of GDOR's illegal search and seizure will deter it and the IRS from their pattern and practice in which the GDOR, with the IRS's participation and encouragement, conducts illegal searches and seizures to find evidence of taxpayers' suspected wrongdoing for the purpose of passing that evidence along to the IRS to facilitate its bringing criminal charges against the taxpayers.  The "appreciable deterrence" provided by applying the exclusionary rule here – stopping this illegal practice – is substantial.  *Herring*, 492 F.3d at 1216 (quoting *Janis*, 428 U.S. at 454).

If the exclusionary rule is not applied, GDOR and the IRS's illegal pattern and practice will continue – with both agencies emboldened – at substantial cost to individual taxpayers' constitutional rights.  Because the deterrence benefits of

23

excluding the evidence are substantial and outweigh the costs, the exclusionary rule applies here. *See Davis*, 564 U.S. at 238; *U.S. v. Watkins*, 981 F.3d 1224, 1232 (11th Cir. 2020) (application of exclusionary rule is justified where deterrence benefits are "substantial and … actually outweigh the costs").

### B.    The Good Faith Exception is Inapplicable

Under the good faith exception to the exclusionary rule, evidence is not rendered inadmissible where officers act "in reasonable reliance upon a search warrant that is ultimately found to be unsupported by probable cause." *U.S. v. Martin*, 297 F.3d 1308, 1313 (11th Cir. 2002). Where officers search and seize the defendant's property without a warrant and without his consent, however, the exclusionary rule applies, the good faith exception does not apply, and evidence obtained as a result of the officers' unlawful search and seizure must be suppressed. *U.S. v. Green*, No. 4:10-CR-21-RLV-WEJ, 2010 WL 4877872, *12 (N.D. Ga. Oct. 6, 2010). Here, the good faith exception does not apply because GDOR obtained no warrant before searching and seizing the Chrisleys' property.

The Government contends the good faith exception applies because it obtained its own warrant to secure the evidence from GDOR. But the good faith exception does not apply where the probable cause for a warrant is based on illegally seized evidence. *See McGough,* 412 F.3d at 1241 (good faith exception did not

24

apply where request for warrant was based not on "objectively reasonable law enforcement activity," but on prior unlawful and warrantless search). Here, although the IRS obtained a warrant for the documents GDOR had already illegally seized, its investigation of the Chrisleys and its warrant request admittedly were based on GDOR's illegally obtained evidence. *See* T-II at 122:19-21; 123:14-16; Govt. Exs. 105, 109, 118. The Government accordingly cannot avail itself of the good faith exception to the exclusionary rule.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, the Government has not met its burden of proof, the exclusionary rule should apply, and the evidence should be suppressed.

Respectfully Submitted,

*/s/ Bruce H. Morris*
Bruce H. Morris
Attorney for Todd Chrisley

Finestone and Morris, LLP
3340 Peachtree Road Northeast, #2540
Atlanta, Georgia 30326

*/s/ Stephen Friedberg*
Stephen Friedberg
Attorney for Julie Chrisley

Suite 2250, Resurgens Plaza
945 East Paces Ferry Road, NE
Atlanta, Georgia 30326

CERTIFICATE OF SERVICE

I hereby certify that I have this day filed the foregoing "DEFENDANTS TODD CHRISLEY AND JULIE CHRISLEY'S POST HEARING BRIEF IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE SEIZED PURSUANT TO SEARCH WARRANTS EXECUTED AT 4125 WELCOME ALL ROAD AND 1800 CENTURY BOULEVARD NE" through this District's ECF system, which will automatically serve all counsel of record.

This 7th day of June, 2021.


/s/ Bruce H. Morris
Bruce H. Morris

10230505.4

# **<u>EXHIBIT A</u>**

10230505.4

**Bruce Morris**

| | |
|---|---|
| **From:** | Krepp, Thomas (USAGAN) <Thomas.Krepp@usdoj.gov> |
| **Sent:** | Monday, May 10, 2021 12:12 PM |
| **To:** | Bruce Morris; 'steve' |
| **Cc:** | Peters, Annalise (USAGAN) |
| **Subject:** | RE: Activity in Case 1:19-cr-00297-ELR-JSA USA v. Chrisley et al Transcript |

Bruce,

We're going to concede standing.

-Tommy

Thomas J. Krepp
Assistant United States Attorney
(404) 581-4647

# **<u>EXHIBIT B</u>**

10230505.4





10230505.4