**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 1:19-CR-00297-ELR-JSA |
| v. | ) | |
| | ) | |
| TODD CHRISLEY a/k/a MICHAEL | ) | |
| TODD CHRISLEY, JULIE CHRISLEY | ) | |
| and PETER TARANTINO, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS TODD AND JULIE CHRISLEY'S SENTENCING**
**MEMORANDUM ON LOSS, FORFEITURE, AND RESTITUTION**

COME NOW the Defendants, Todd and Julie Chrisley, by and through counsel, and hereby submit this Sentencing Memorandum on Loss, Forfeiture, and Restitution, respectfully showing this Court as follows:

## I.    Introduction

The Government's calculations of actual loss, restitution, and forfeiture are inaccurate and largely unsubstantiated, resulting in a significant and unjustified inflation of the Chrisleys' recommended sentences under the U.S. Sentencing Guidelines Manual ("U.S.S.G").  In this memorandum, the defense will provide the Court with the proper methods of calculation.

## II.    Intended Loss

Todd and Julie Chrisley contend that, for all loans cited in their Presentence Investigation Reports ("PSRs"), actual loss, rather than intended loss, should guide the Court's loss calculation under the Sentencing Guidelines. Actual loss should be the determinative calculation because, like the defendant in *United States v. Ridling*, 2022 WL 4134423 (11th Cir. Sept 13, 2022), there is evidence that Todd Chrisley intended to repay the loans, and did in fact repay a portion of them.

The Government urges this Court to find that *Ridling* does not apply to the Chrisleys. *See* Government' Sentencing Memorandum ("Gov. Sent. Mem.") at 12, Doc. 305 ("This case is nothing like *Ridling*."). The Defendants are having difficulty understanding how the Government can distinguish this case from *Ridling* with such ease. In *Ridling*, the defendant "lied about his assets and fabricated documents, including tax returns and account statements," and was subsequently convicted of, *inter alia*, wire fraud and bank fraud.  *Ridling*, 2022 WL 4134423 at *1.  The defendant used the loans and lines of credit for what appears to be a combination of business and personal expenditures, including using funds from one loan to pay off another loan.  *Id*.  Furthermore, the defendant contended that "he intended to repay the loans he took out and, in fact, he did repay some of the loans." *Id*.  The district court incorrectly found that the intended loss was the full amount of the fraudulently obtained loans based on a recklessness standard. *Id*. at *1-2. It rejected the

defendant's argument that *actual loss* was the appropriate measure of loss in his case because he intended to repay the loans. However, as the Eleventh Circuit noted in its opinion vacating the defendant's sentence, the applicable Guideline requires a higher level of culpability and cited to U.S.S.G. § 2B1.1, cmt. n.3(A)(ii) which defines "intended loss" as "the pecuniary harm that the defendant purposely sought to inflict." *Id.*

Neither of the Chrisleys "purposely sought to inflict" the harm upon the banks; there is ample evidence that Todd Chrisley intended to repay the bank loans.[1] As the Court found in *Ridling*, this Court should use actual loss, not intended loss, in determining the sentence in this case. The Government does not dispute this finding. Doc. 305 at p. 12 ("[T]he $20 million figure is the actual loss to victim banks – not the intended loss."). Because both parties agree that "actual loss" is the appropriate measure of loss in this case, the Chrisleys address the Government's actual loss calculation.

---

[1] Principal and interest payments were made on the loan prior to the collapse of the housing market, and some were even repaid in full. *See, e.g.,* Todd Chrisley's PSR at ¶ 53. Additionally, Todd Chrisley invested substantial sums into the property which he was pledging as collateral on these loans, including in the form of down payments. *See* Declaration of Rhonda Smith, Def. Sent. Exhibit 1, Bates Stamp No. SENTENCING 1.

## III. Actual Loss

The Government's Sentencing Memorandum grossly overstates the actual loss amount by including loans that were approved and obtained *prior to any fraudulent documents being submitted to the banks* in question and by failing to account for significant credits against loss that the Defendants brought to the Government's attention in their objections to the PSRs. Gov. Sent. Ex. 1.[2]

### a. *The Government has failed to provide reliable and specific evidence of its estimated loss amount.*

The Government attempts to disregard arguments concerning the deficient evidentiary support for its sentencing recommendations as "attempts to re-interpret the evidence from trial…" Gov. Sent. Mem. at 3, Doc. 305. Yet, it is well-established that "the government must prove the facts underlying a proposed sentence by a preponderance of the evidence, and the district court must hold it to that burden and must support its loss calculation with reliable and specific evidence." *United States v. Campbell*, 765 F.3d 1291, 1304 (11th Cir. 2014) (internal punctuation omitted) (citing *United States v. Rodriguez,* 732 F.3d 1299, 1305 (11th Cir.2013); *United States v. Munoz,* 430 F.3d 1357, 1370 (11th Cir.2005)).

---

[2] For the sake of consistency, Defendants will follow the Government's lead and cite to the exhibits at trial as "Gov. Ex." or "Def. Ex." However, exhibits submitted with various sentencing memoranda will be cited as "Gov. Sent. Ex." Or "Def. Sent. Ex."

While the Government halfheartedly acknowledges it must support its loss calculation with "reliable and specific evidence," it notes it is not required to "sift through years of bank records and receipts to ascertain itemized proof of every single transaction that should be chalked up as a loss to the victim" or conduct "an exhaustive inquiry." Doc. 305 at p. 6 (citing *Campbell,* 765 F.3d at 1304; United States v. Orton, 73 F.3d 331, 334-35 (11th Cir. 1996)).[3]

The Government further emphasizes that, for sentencing purposes, *the Court* may reasonably estimate the loss amount based on the evidence available. However, the Government misinterprets its burden under the Sentencing Guidelines and applicable case law. Gov. Sent. Mem. at 5-7, Doc. 305. Although the Government may base its loss figure on a reasonable estimate given the information available to it, "*[u]pon challenge,* however, the government bears the burden of supporting its loss calculation with reliable and specific evidence." *United States v. Cabrera*, 172 F.3d 1287, 1292 (11th Cir. 1999) (emphases added) (internal quotations omitted). This makes sense, as the Court is not permitted to "speculate about the existence of a fact that would result in a higher sentence." *Id*.

---

[3] The defendant in *Campbell* argued it should have been credited for various legitimate expenses, such as vehicle leases, while *Orton* concerned a Ponzi scheme involving contributions from forty-four victims amounting to approximately $525,000.

Moreover, the loss is not difficult to calculate in this case. In all instances where the Government and Defendants disagree over the proper estimation of loss, Defendants have provided the Government with evidence that calls into question the reliability or specificity of its proposed calculation. None of the loss estimations that remain in dispute would require the Government to "sift through years of bank records and receipts."

For example, in the Presentence Investigation Report ("PSR"), probation cited the actual loss amount on the Regions Bank loans as $750,000, the combined original principal balance of the loans. PSR at ¶ 76. In response to the Defendants' objection on this calculation, the Government provided an email sent to Agent Ryskoski on August 22, 2022 (a week before the PSR was prepared)[4] by a representative for Regions wherein the representative states that the Regions corporate office researched the loans in question and determined "$624,798.70 was left unpaid on the loans." Def. Sent. Ex. 3. The representative also indicated that he would be providing Agent Ryskoski "an official document detailing [Region's]

---

[4] Despite receiving an email stating that Regions' loss was over $100,000 lower than claimed in the PSR a week prior to its preparation, the Government either elected not to share that information with probation, or probation elected not to use it in calculating loss. Either way, the Government made no effort to correct the miscalculation prior to receiving the Defendants' PSR objections. This is just one example of the Government's repeated attempts to ignore the Defendants' requests for information, which in turn impacts the Defendants' ability to effectively respond to the Government's sentencing recommendations.

losses." *Id.* In response, counsel for the Defendants asked the Government to provide the official document from Regions in order to confirm that the amount "left unpaid on the loans" does not include interest, late fees or other penalties pursuant to U.S.S.G. § 2B1.1, cmt. n.3(D)(i) which states "loss shall not include…interest of any kind, finance charges, late fees, penalties…or other similar costs." To date, the Government has not responded to the Defendant's objection and request. This is just one example of how the Government's flawed estimation of loss is not due to its inability to "sift through years of bank records;" the Defendants only remaining request with respect to Regions is for the Government to ensure Regions did not include interest or penalties in its loss calculation, as it was not clear by the language in the email sent to Agent Ryskoski.

The Government cites two cases in support of its contention that the "starting point" in calculating loss should be the full amount that was transferred from the victim. Doc. 305 at 6-7 (citing *United States v. Campbell*, 765 F.3d 1291 (11th Cir. 2014) and *United States v. Armas*, 712 F. App'x 923 (11th Cir. 2017)). In *Campbell*, the defendant argued for a reduction in the loss amount by using a calculation based on the defendant's gain with deductions based on legitimate expenses. *Campbell*, 765 F.3d at 1299. The court in *Armas* declined to review the defendant's challenge to loss because he invited any alleged error by failing to object to the loss calculation. *Armas*, 712 Fed. App'x. at 929. Neither case is applicable here; the Defendants have

made particularized objections on certain loss calculations and requests for supporting documentation to which the Government either denied outright or provided evidence that is not reliable or specific. On those loans where the Government continues to ignore Defendants' requests for supporting documentation, and for loans that the Government has only provided general, speculative loss calculations, the Court should decline to include them in its estimation of loss.

### b. Julie Chrisley is not responsible for losses that occurred as a result of loans obtained prior to her entry into the conspiracy.

The Government asserts that "Julie Chrisley claims there is no evidence she was ever part of the bank fraud conspiracy…" Doc. 305 at 12. However, Mrs. Chrisley's objections on her liability for loss and forfeiture *are not a dispute over her conviction for the bank fraud conspiracy.* Rather, Mrs. Chrisley objects that the Government has not proven *when* she joined the conspiracy, and "[a] defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct." U.S.S.G. § 1B1.3, cmt. 3(B); *see also United States v. Westry*, 524 F.3d 1198, 1220-21 (11th Cir. 2008) (citing *United States v. Hunter*, 323 F.3d 1314 (11th Cir. 2003) ("a defendant cannot be held accountable for conduct that occurred prior to his entry

into the conspiracy.").[5]   As the Eleventh Circuit has explained, "[t]he limits of sentencing accountability are not coextensive with the scope of criminal liability." *Hunter*, 323 F.3d at 1319.  It is on this basis that Julie Chrisley asserts she should not be sentenced in reference to relevant conduct which falls outside the scope of her participation in the conspiracy.

"[T]o determine a defendant's liability for the acts of others, the district court *must first make individualized findings concerning the scope of criminal activity undertaken by a particular defendant." Id.* (internal quotations omitted).  In *Hunter*, the Eleventh Circuit vacated the defendant's sentence because the district court did not make the proper inquiry into the scope of each defendants' agreement in the larger unlawful operation. *Id.* at 1320. Importantly, in determining the scope of a defendant's liability, "the fact that the defendant knows about the larger operation, and has agreed to perform a particular act, does not amount to acquiescence in the acts of the criminal enterprise as whole." *Id.*  The defendant in *Hunter* was proven to have cashed several counterfeit checks over a four-year period, accompanied co-defendants when they cashed counterfeit checks, opened an account for a co-

_____

[5] There was no special verdict returned by the jury or requested by the Government as to the date Julie Chrisley joined the conspiracy. The jury was instructed that it is sufficient to find Julie Chrisley guilty of the bank fraud conspiracy if it found that she "had a general understanding of the unlawful purpose of the plan—and willfully joined in the plan *on at least one occasion*…" *See* Court's Instructions to the Jury, attached as Defendant's Sentencing Exhibit 2.

defendant to deposit counterfeit checks into, and the defendant identified other members of the conspiracy. *Hunter*, 323 F.3d at 1320-1321. The Eleventh Circuit did not subscribe to the prosecution's assertion that these facts should make the defendant liable for the entire scope of the conspiracy. *Id.*

The Government would prefer this Court bypass the requirement that it first determine the scope of Mrs. Chrisley's agreement because it cannot point to one fact on the record showing that she was a participant in the conspiracy at the time the loans in question were obtained. In fact, the only thing that the Government *can* point to indicating that Mrs. Chrisley was a knowing participant in the conspiracy is an email from Julie Chrisley in 2012 which the Government heavily relied on in their conspiracy case against her wherein she informs Mark Braddock that the post date of the attached check needed to be changed. Gov. Ex. 890.

The Government's first attempt to do so is by making a conclusory statement that "Braddock testified that Julie was an active member of the conspiracy from its inception…" Doc. 305 at 13. However, even if the Court is to find Mark Braddock's testimony credible, he did not testify to a particular time after 2007 that Julie Chrisley became "involved" in the conspiracy. *Id.* In fact, when asked about Mrs. Chrisley's knowledge, Braddock testified that "[s]he understood their financial position to be where it was and that she had to kind of juggling [sic] money to keep things paid." Trial Tr. at 1497. When asked whether Julie Chrisley was aware of

the fraudulent documents that were going to the banks, Braddock testified "I didn't directly send any of the documents to her. You know, I would be guessing if I said she had seen them." Trial Tr. at 1497-98. Finally, Braddock testified that he and Julie Chrisley "discussed the fact that [they] just had to keep showing the picture being good so that he could keep getting loans, otherwise, the world would kind of come crashing down." Trial Tr. at 1498. Braddock's testimony shows that Julie Chrisley had limited knowledge of the bank fraud for the majority of the conspiracy.

The loans in question were primarily obtained between 2006 and 2007. *See generally,* PSR at ¶¶ 30-80. Three of the loans were obtained in 2008; however, the Embassy Bank loan obtained in 2008 resulted in no loss to the bank. PSR at ¶¶ 38, 49-53. Only one loan was obtained after 2008, and that was a loan from Athens First Bank & Trust on August 15, 2009. PSR at ¶ 40.

The Government's next attempt to impute knowledge and participation in the conspiracy is Braddock's testimony that Julie complimented him on his scrapbooking because when she tried to do it, "it didn't line up, it didn't make sense." Trial Tr. at 1534. Once again, this testimony does nothing to put a time period on Julie Chrisley's participation in the conspiracy. Julie Chrisley could have easily been referring to an attempt to scrapbook the check she sent to Braddock in 2012 to be changed. Also, the fact that Julie Chrisley was "running around" trying to get past-due "bills" paid does not import knowledge of the conspiracy or an agreement to

participate in the full scope of the conspiracy. Doc. 305 at 13 (quoting Trial Tr. at 1539).

Finally, though the Government cites five documents in support of its contention that "[n]umerous emails and records admitted during trial confirm her involvement from the scheme's inception," the cited evidence clearly does not support such a conclusion. The first document (Gov. Sent. Ex. 4) is an email from Mark Braddock transmitting documents to four different people, one of whom was Julie Chrisley. In addition to the fact that it was Mark Braddock—not Julie Chrisley—sending these documents, there is no evidence that Julie Chrisley read this email or its attachments. Further, there is no evidence that Mrs. Chrisley knew or would have known these documents to be false. Julie Chrisley is not even copied or a recipient in the next two sets of emails cited by the Government (Gov. Exs. 809, 810). The Government also refers to the email sent by Julie Chrisley to Braddock related to the post date on a check (Gov. Ex. 890) which, as previously discussed, did not occur until 2012 well after all of the loans in question were obtained. In the final email cited by the Government, Todd Chrisley directs Julie to "take care of getting her the new insurance information and Mark will get her the new pfs as well as getting her the new tax returns," presumably referring to someone who worked at Integrity Bank based on the subject of the email. Gov. Ex. 824. This email relates to a car loan that was fully paid off, not one of the property loans at issue in this case.

The Government has offered no proof that Julie Chrisley knew what the contents of the personal financial statement and tax returns would be, much less that they would be false. Perhaps more importantly, he was not directing Julie to create, falsify, or send them; he asked Julie to send insurance information to the bank. There is nothing within any of the Government's evidence that purports to show that Julie Chrisley knew of, or was a participant in, the conspiracy prior to 2012. As such, the Court should not find Julie Chrisley liable for loss, restitution, or forfeiture for any loans obtained prior to 2012.

### c. The Government cannot show that the Chrisleys were the cause of the FDIC and failed bank losses or what that amount entails for the purposes of actual loss and restitution.

The Government asks the Court to accept that "[i]t does not matter that the banks later failed or sold the loans to third parties. Nor does it matter that the Chrisleys 'believe' (without offering proof or estimated figures) that third parties may have paid additional sums of money when purchasing these loans." Doc. 305 at 10. However, like restitution, U.S.S.G. § 2B1.1, cmt. n.3(A)(i) imposes a causation analysis before actual loss can be attributed to the defendant. *See United States v. Hicks*, 217 F.3d 1038, 1048 (9th Cir. 2000), *as amended on denial of reh'g* (July 31, 2000) ("Like other courts to consider this provision, we believe the term "resulted from" establishes a causation requirement."); United *States v. Rothwell*, 387 F.3d 579, 583 (6th Cir. 2004) (finding the district court's loss analysis faulty

"because it ignored the causation requirement inherent in the rules for determining loss"); *United States v. Ramos-Delgado*, 763 F.3d 398, 401 (5th Cir. 2014) ("the only causation requirement is that contained in 1B1.3").

The Defendants incorporate herein the arguments contained in Section IV.A. of Todd Chrisley's Memorandum in Support of a Below Guideline Sentence (Doc. 308). Another critical amount to be considered from a causation standpoint is the amount the Government currently attributes to the FDIC on behalf of failed banks, which constitutes approximately $15,585,632.00 of loss claimed by the Government. Gov. Sent. Ex. 1. The Government contends that the fraud "'proximately' caused the loss, insofar as the causal chain between the two was 'not too attenuated (either factually or temporally)' but rather closely connected to the fraudulent conduct." Doc. 305 at 47 (citing *United States v. Robertson*, 493 F.3d 1322, 1344). However, later in the Government's brief, it sets out the very information that demonstrates the break in the causal chain, and hence the reason the approximately $15 million should be excluded from the loss and restitution calculations. Doc. 305 at 53. The Government demonstrates the essential break in the causal chain by citing the massive collapse of banks, not only around the United States, but specifically in Georgia. As the Government states, a total of 87 banks failed in Georgia, and the Federal Reserve's Sixth District (which includes the state

of Georgia) accounted for more than one-third of the nations bank failures between 2008 and 2013. Doc. 305 at 53.

Todd and Julie Chrisley did not cause that collapse. More importantly, the Chrisleys did not cause the FDIC to sell the loans at issue for cents on the dollar. The FDIC chose a strategy to liquidate these loans that utilized companies (vulture capital) that could take control of the loan, file lawsuits against the guarantors on the loans, and foreclose on all of the property that collateralized the loan, thus reducing all the loans to cash. *Of that cash, the FDIC stood to gain up to 60% of the profits generated by the vulture capital companies. See* Def. Sent. Ex. 3 (FDIC Webpage showing FDIC sold only 40% of the equity in bundle of loans to Rialto Capital Management LLC). The causal chain between the offense and any purported loss was broken when the FDIC elected to sell the loans in question for a pennies on the dollar.

> ### d. Neither Todd nor Julie Chrisley should be held liable for bank loans cited in the PSR that were obtained prior to any false documents were alleged to have been transmitted to the bank.

Actual loss is defined in the sentencing guidelines as "the reasonably foreseeable pecuniary harm *that resulted from the offense*." U.S.S.G. § 2B1.1, cmt. n.3(A)(i) (emphasis added). As such, the Guidelines require a showing of causation in order for a specified harm to be included in the loss calculation. *Hicks*, 217 F.3d at 1048; *Rothwell*, 387 F.3d at 583; *Ramos-Delgado*, 763 F.3d at 401-02. Indeed,

even the Government acknowledges that the Court should at least use a but-for analysis with respect to the claimed losses. Doc. 305 at 10 ("But for the conspirators' false loan applications, the victim banks would not have issued the loans."). However, many of the loans the Government seeks to use in support of its loss calculation were obtained prior to false documentation being sent to the banks in question. These losses fail on two grounds: (1) because the banks were not relying on any false information when it approved the loans, any harm to the banks did not "result from the offense;" and (2) because no misrepresentations were made in obtaining the bank loans, they would fall outside "the scope of criminal activity undertaken" by either defendant. *Hunter*, 323 F.3d at 1319.

The table attached to the Government's Sentencing Memorandum as Exhibit 1 contains columns showing the date the loan was obtained ("Note Date"), as well as the "Date of Misrepresentation" for each loan the Government alleges should be included in the loss calculation. Gov. Sent. Ex. 1. Three loans from Alpha Bank & Trust were obtained prior to the "date of misrepresentation" which account for $2,572,500 in loans that the Government seeks to include in its loss calculations. Gov. Sent. Ex. 1, Rows 5-7. Both of the Buckhead Community Bank loans were obtained prior to any misrepresentations to the bank. Gov. Sent. Ex. 1, Rows 10-11. One Haven Trust Bank loan and two Midtown Bank loans were obtained prior to the date of misrepresentation. Gov. Sent. Ex. 1, Rows 20, 24-25. Additionally, the

Government must provide some evidence that false documents were sent or misrepresentations were made on July 11, 2007 in order to prove by a preponderance of the evidence that these loans were even fraudulently obtained. Gov. Sent. Ex. 1, Rows 1-4 ("Notes" column cites an email from the bank requesting verification of liquidity of securities but does not cite any misrepresentations by Mark Braddock or the Chrisleys in response to that email).

For the reasons stated above, none of the loans that were obtained prior to any misrepresentations to the banks can be included in the loss amount or the restitution and forfeiture calculations because they were not fraudulently obtained. With these loans excluded from consideration, the new loss calculation for Todd Chrisley would be as outlined in Table 1, below. Julie Chrisley's loss amount would remain at zero because all of these loans were obtained prior to any date upon which the Government can show she joined the conspiracy. *See supra* Section III.b.

Table 1

| Bank | Actual Loss | Explanation of differences between Defendant's Calculation and Government's Calculation in Gvt. Sent. Ex. 3 |
|---|---|---|
| Alpha Bank & Trust | $0.00 | - Loans 8000000, 8100000, and 820000 were obtained prior to "Date of Misrepresentation" (Gvt. Sent. Ex. 1, Rows 5-7).<br>- Loans 70002141, 7002144, 7002198, and 7002357: No actual misrepresentation was shown (Gvt. Sent. Ex. 1, Rows 1-4). |
| Athens First Bank & Trust (Synovus) | $2,786,390.07 | *See* Defs. Sent. Exhibit 1, Declaration of Rhonda Smith at ¶¶ 27-33 for explanation of loss calculation. |
| Buckhead Community Bank (Cadence) | $0.00 | All loans obtained prior to "Date of Misrepresentation" (Gvt. Sent. Ex. 1, Rows 1-4). |

| | | |
|---|---|---|
| Embassy Bank | $0.00 | Undisputed by the parties (PSR at ¶ 53) |
| Haven Bank (FDIC) | TBD | - Haven loans 700022353, 700022833, 700022841, and 700024581 were assigned to the FDIC. At this time, the Government has not provided reliable and specific evidence for loss on these loans, as it has not provided support for the amount the FDIC claims it received from the sale of these loans to LNV Corporation. *See supra* Section III.c.<br>- Loan 700024581 was obtained prior to the Date of Misrepresentation. (Gvt. Sent. Ex. 1, Row 20). |
| Haven Bank (FDIC/Res-GA) | TBD | - Haven loan 700024052 (mistakenly referred to as 700024581 in the PSRs) was assigned to the FDIC. At this time, the Government has not provided reliable and specific evidence for loss on this loan, as it has not provided support for the amount the FDIC claims it received from the sale of these loans to Res-GA and has not accounted for money for proceeds from the foreclosure and sale of property securing the loans. *See supra* Section III.c. |
| Integrity Bank (FDIC/Res-GA) | TBD | - Loans 400841700 and 400848200 were assigned to the FDIC. At this time, the Government has not provided reliable and specific evidence for loss on these loans, as it has not provided support for the amount the FDIC claims it received from the sale of these loans to Res-GA and has not accounted for money for proceeds from the foreclosure and sale of property securing the loans. *See supra* Section III.c. |
| Midtown Bank | $831,879.00 | - Loans 180161102 and 195161101 were obtained prior to "Date of Misrepresentation" (Gvt. Sent. Ex. 1, Rows 24-25).<br>- Remaining loan, 180161101, was secured by property located at 1067 Corsica Drive and 209 Belle Pines Ct.<br>- Midtown received $268,121 from the sale of property securing loan 180161101, so loss to Midtown is $831,879.00 ($1,100,000 - $268,121). (PSR at ¶ 71). |
| Regions Bank | $624,798.70* | It is unclear based on the evidence provided by the Government whether this calculation properly excludes interest, late fees, and penalties, as required by 2B1.1. |
| Security Bank | $0.00 | Undisputed by the parties (PSR at ¶ 78) |
| United Community Bank | $0.00 | Loans obtained prior to "Date of Misrepresentation" (Gvt. Sent. Ex. 1, Row 29) |
| **Estimated Loss** | $4,243,067.77 | |

As is apparent from the chart above, the offense did not involve ten or more victims. A "victim" means "any person who sustained any part of the actual loss." U.S.S.G § 2B1.1, cmt. n.1. As such, the Government's number of victim banks is limited to those banks that, after all credits against loss, sustained part of the actual loss calculation above. Even if the Court includes the failed banks/FDIC as victims, despite the analysis above and the Government's failure to proffer reliable evidence of actual loss, there are only five victim banks (Athens First Bank, Haven Bank, Integrity Bank, Midtown Bank, and Regions Bank).

**IV.   The Government's failure to provide specific notice and to submit a preliminary order of forfeiture deprives the Defendants of due process.**

While the Government provided notice of the general items to be forfeited in the forfeiture provision of the indictment, it never provided a bill of particulars setting out what loans would be considered for forfeiture. Also, Fed. R. Crim. Proc. 32.2(a) provides that "[t]he indictment or information need not identify the property subject to forfeiture or specify the amount of any forfeiture money judgment that the government seeks." However, the Government still needed to provide the critical notice of what additional loans, beyond those set out in the indictment, would form the basis for the forfeiture money judgment.

Courts *must*, as soon as practical after a guilty verdict, determine "what property is subject to forfeiture under the applicable statute." Fed. R. Crim. Proc. 32.2(b)(1)(A). In cases where the government is seeking a personal money

judgment, "the court must determine the amount of money that the defendant will be ordered to pay." *Id.* Although the indictment need not specify the amount of any forfeiture money judgment being sought, "[i]f the court finds that property is subject to forfeiture, it *must* promptly enter a preliminary order of forfeiture setting for the amount of any money judgment…" Fed. R. Crim. Proc. 32.2(b)(2)(A) (emphasis added). Furthermore, the preliminary order of forfeiture must be entered "sufficiently in advance of sentencing to allow the parties to suggest revisions or modifications before the order becomes final…" Fed. R. Crim. Proc. 32.2(b)(2)(B).

While the Government met the notice requirements to obtain a personal money judgment against Todd and Julie Chrisley, it did not provide notice of the amount of personal money judgment it would be seeking against them until filing its Motion for Order of Forfeiture a week before sentencing.

The Government failed to submit a proposed preliminary order of forfeiture within an appropriate amount of time after the verdict was entered and as a result, the Government has violated the Federal Rules of Criminal Procedure. This violation has significantly prejudiced the Defendants in preparation for sentencing and judgment because they have been required to prepare for the forfeiture portion of sentencing without notice of a total amount proposed or which loans the Government would be using in its forfeiture calculation. *See United States v. Mincey*, 800 Fed. Appx. 714, 728 (11th Cir. 2020) (citing *United States v. Farias*, 836 F.3d 1315 (11th

Cir. 2016)) ("a district court's violation of Rule 32.2 [is] harmless where (1) the defendant had fair notice that the government would seek forfeiture and in what amount and (2) the defendant had the full opportunity to contest the forfeiture."). Because the Chrisleys were not given "fair notice" of the amount the Government sought to be forfeited due to failures on the part of the prosecution to provide the Court with forfeiture amounts so that a preliminary order of forfeiture could be issued, to order forfeiture at this stage would violate the Defendant's due process rights under the Fifth Amendment.

The Government should be limited to forfeiture related to the loans detailed in the Indictment because the Defendants have not had notice, by way of the Indictment or a bill of particulars, of the Government's intent to seek forfeiture on any other bank loans.

## V. Todd and Julie Chrisley should not be liable for forfeiture of loan proceeds that were obtained by co-conspirators.

There was a long-standing consensus among the Circuits that joint and several liability applied to forfeiture judgments, but that view was rejected by the Supreme Court in 2017. *See Honeycutt v. United States*, —— U.S. ——, 137 S. Ct. 1626 (2017). Consequently, Todd and Julie Chrisley cannot be held liable for loan proceeds that they did not personally obtain.

### a. *Honeycutt v. United States*

*Honeycutt* involved a Sixth Circuit case wherein the district court held two defendants jointly and severally liable for a forfeiture money judgment for the proceeds of their drug conspiracy pursuant to 21 U.S.C. § 853. *United States v. Honeycutt*, 816 F.3d 362 (6th Cir. 2016) (following the majority rule in finding that § 853 allowed for joint and several liability). The Supreme Court construed the meaning of the phrase requiring the defendant to forfeit any proceeds "the person obtained" as a result of the violation. *Honeycutt*, 137 S. Ct. at 1632. The Court ruled that Congress intended to limit a defendant's liability to what he personally obtained, not "property that was acquired by someone else." *Id*. at 1632-33. The Court's holding has been extended to other forfeiture statutes with identical or similar language. *United States v. Elbeblawy*, 899 F.3d 925 (11th Cir. 2018), *cert denied*, —— U.S. ——, 139 S. Ct. 1322, 203 L.Ed.2d 573 (2019) (*Honeycutt* applies to forfeitures for health care offenses under § 982(a)(7)); *United States v. Chittenden*, 896 F.3d 633 (4th Cir. 2018) (*Honeycutt* applies to forfeitures under § 982(a)(2)); *United States v. Brown*, 694 Fed. Appx. 57 (3d Cir. 2017) (same). Because the forfeiture money judgment for the bank fraud offense is brought under 18 U.S.C. § 982(a)(2), which contains the same language limiting forfeiture to proceeds the defendant obtained, Todd and Julie Chrisley cannot be held liable for loan proceeds they did not personally obtain.

### b. *Loan Proceeds Obtained by Mark Braddock*

The Court should limit Todd and Julie Chrisley's forfeiture judgment to the loan proceeds that Todd and Julie Chrisley had an "unfettered right to enjoy the whole" of the proceeds. *United States v. Thompson*, 990 F.3d 680, 691-92 (9th Cir. 2021), *cert denied*, 211 L. Ed. 2d 384, 142 S. Ct. 616 (2021) (holding that defendants are only responsible for forfeiting "proceeds that came to rest with them" after the proceeds were divided among the co-conspirators).

Furthermore, 21 U.S.C. § 853(p), applicable through reference in 18 U.S.C. § 982(b)(1), allows the court to order forfeiture of substitute property only when recovery of the property directly forfeitable is no longer available due to an act *of the defendant*. *See* 21 U.S.C. § 853(p)(1). The Court cannot estimate what portion of the directly forfeitable assets, if any, is not available for forfeiture as a result of acts or omissions of Todd and Julie Chrisley. This is embodied in the Presentence Report's statement that "Braddock did, in fact, get millions from the fraud…" PSR at ¶ 29. Therefore, this Court should not hold Todd and Julie Chrisley responsible for the amount of money Braddock stole because, under *Honeycutt*, that money would not constitute proceeds that either of them "obtained" from the fraud nor did they cause that money to be unavailable for forfeiture – Braddock did. If the Government was concerned with obtaining a forfeiture judgment for loan proceeds that were obtained by Mark Braddock, it should have indicted him or pursued

forfeiture of his proceeds civilly.[6] Despite Braddock's significant role in the bank fraud offense and his obtaining substantial portions of loan proceeds, the Government gave him full immunity, but it cannot now try to make up for that mistake by holding the Chrisleys liable for proceeds they never obtained.

In addition to the Government's failure of proof with respect to the amount of proceeds Todd or Julie Chrisley "obtained," the Government has never disclosed or proven the amount of money retained by Mark Braddock as a result of the conspiracy. Therefore, there is no way for the court to reasonably calculate any forfeiture judgment against Todd and Julie Chrisley. It is the Government's burden to prove the elements of forfeiture under § 982 by a preponderance of the evidence. *United States v. Waked Hatum*, 969 F.3d 1156, 1162 (11th Cir. 2020). The Court cannot reasonably extrapolate a forfeiture money judgment for Todd and Julie Chrisley until the Government meets its burden of proof with respect to the amount of fraud proceeds each of them personally obtained and/or presents proof of the amount of bank fraud proceeds Braddock actually took.[7]

---

[6] As part of an immunity agreement, the Government could have negotiated the civil forfeiture of the ill-gotten gains obtained by Mark Braddock.

[7] The Defense made a post-conviction Brady demand for this information. The Government has access to Braddock and all of the accounts used in the fraud. Therefore, the Government could have calculated how much of the fraud proceeds he obtained. Those funds should result in a direct credit to the Chrisleys on loss amount, forfeiture, and restitution.

### c. *Loan Proceeds Obtained by Todd and Julie Chrisley*

In *United States v. Cingari*, the Eleventh Circuit held that a husband and wife *may* be jointly and severally liable for proceeds in circumstances where they jointly operated their unlawful business and the proceeds were "going into the family coffers." *United States v. Cingari*, 952 F.3d 1301, 1305-06 (11th Cir. 2020), *cert denied*, 208 L. Ed. 2d 409, 141 S. Ct. 835 (2020). However, this Court should limit Julie Chrisley's forfeiture liability to only those loan proceeds derived from loans obtained after to the time she joined the conspiracy because, once again, the Government has not proven or articulated when Julie Chrisley joined the conspiracy, and "[a] defendant cannot be held accountable for conduct that occurred prior to his entry into the conspiracy." *United States v. Westry*, 524 F.3d 1198, 1220-21 (11th Cir. 2008) (citing *United States v. Hunter*, 323 F.3d 1314, 1320 (11th Cir. 2003)).

To the extent the Court finds proceeds of the fraud prior to Julie Chrisley joining the conspiracy "went into the family coffers," it should attribute those proceeds to Todd Chrisley for forfeiture purposes.

## VI.     Todd and Julie Chrisley should not be held liable for forfeiture on loans that were obtained prior to a misrepresentation to the bank in question.

The Government's Motion for Order of Forfeiture cites $17,270,741.57 as the amount representing "net proceeds" of the offense. Doc. 306 at 4. However, forfeiture in this case is limited to proceeds the Defendants "obtained directly or indirectly, as the result of" the bank fraud violations and conspiracy. 18 U.S.C. §

982(a)(2)(A).  For the reasons stated herein, the Government cannot meet its burden of proof with respect to loans that were obtained *prior* to the date of misrepresentation in its loss table. *See supra,* Section III.d.

## VII.  Forfeiture in this case is limited by the Excessive Fines Clause of the Eight Amendment.

The Eleventh Circuit has held that, because criminal forfeiture money judgments are "intended to punish," they are a "fine" subject to the Eighth Amendment and violate the Excessive Fines Clause if they are "grossly disproportional to the offense." *United States v. Waked Hatum*, 969 F.3d 1156, 1167 (11th Cir. 2020), *cert. denied sub nom. Hatum v. United States*, 142 S. Ct. 72, 211 L. Ed. 2d 12 (2021) (citing *United States v. Bajakajian*, 524 U.S. 321, 118 S. Ct. 2028 (1998).  The Eleventh Circuit considers three factors in determining whether a forfeiture money judgment violates the Eighth Amendment: "(1) whether the defendant falls into the class of persons at whom the criminal statute was principally directed; (2) other penalties authorized by the legislature (or the Sentencing Commission); and (3) the harm caused by the defendant." *Id*. (quoting *United States v. Sperrazza*, 804 F.3d 1113, 1127-28 (11th Cir. 2015)).  With respect to the second factor, "[i]f the value of the forfeited property is within the permissible range of fines under the relevant statute or sentencing guideline, the forfeiture is presumptively constitutional." *Id*. at 1168.  The applicable statutory fine in this instance is 18

U.S.C. § 1344, which has a maximum statutory fine of $1,000,000. Additionally, 18 U.S.C. § 1349, the basis for the conspiracy count, prescribes that the maximum fine is that which is provided for in the underlying substantive offense. As such, the maximum statutory fine for the bank fraud offenses in this case is $7,000,000 (six substantive bank fraud counts plus the conspiracy count). It would be grossly disproportional to order the defendants to forfeit an amount equivalent to the total loan proceeds when they have paid millions on the loans, thereby reducing the harm; Mark Braddock obtained millions in fraudulent loan proceeds; and the total amount of loan proceeds far exceeds the statutory maximum fine for the combined bank fraud counts in this case. A forfeiture in the scale of what the Government is advocating for would clearly violate the Excessive Fines Clause of the Fifth Amendment.

**VIII. The Court should not hold Julie Chrisley liable for restitution to any lender banks, their assignees, or the FDIC.**

*a. The Government has not identified a "victim" eligible to receive restitution for bank loans that were assigned by the FDIC.*

Loans from four failed banks listed in the PSR were assigned by the FDIC. The Alpha Bank & Trust ("Alpha Bank") loans were assigned to FH Partners, LLC ("FH Partners"); the Haven Trust Bank ("Haven Bank") loans were assigned to LNV Corporation ("LNV") and RES-GA Buckhead, LLC ("Res-GA"); and the Integrity Bank loans were assigned to Res-GA (collectively, "Assignees"). The PSR

originally listed Stearns Bank, Truist, and Res-GA in its "Bank Fraud and Loss Summary." None of the entities listed are eligible victims capable of receiving restitution under the Mandatory Victim's Restitution Act ("MVRA").[8]

Under the MVRA, a defendant convicted of various offenses is required to make restitution to the victim of their offense. The MVRA defines a "victim" as "a person directly and proximately harmed" as a result of the offense. 18 U.S.C. § 3663A(a)(2). In the case of a conspiracy, the victim includes "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *Id.* The burden of proving, by a preponderance of the evidence, the amount of loss to each victim is on the Government. 18 U.S.C. 3664(e).

> i.     *The Government's failure to produce unredacted assignments has made it impossible to determine whether any of the entities in question were "harmed" by the offense.*

When the FDIC assigns loans that belonged to a failed bank, it packages loans into batches with varying face value and viability. Counsel for the Defendants made the following Brady demand on the Government in preparation for sentencing:

---

[8] In documents that were exchanged with the Government as part of a meet and confer in advance of sentencing, the Government appears to agree that the assignees (LNV Corporation, Res-GA, and FH Partners) are not victims in this case. This is likely because they not only did not suffer a loss, but in fact generated a profit which was ultimately shared with the FDIC. The Government also seems to have changed its position with respect to Stearns Bank and Truist, as it has removed these banks as victims since the initial draft of the PSR. This point is made to preserve the Defendants' argument in the event the Government changes its position at sentencing.

> Unredacted copies of all relevant FDIC agreements in which any entity acquired any of the loans for which the government contends either restitution and/or forfeiture is due and, to the extent the relevant loans were sold as part of a larger group of loans, any document reflecting the value of those loans along with the value received by FDIC when the loan was taken from a failed bank and sold to another bank or entity.

Def. Sent. Ex. 4. The purpose of this Brady demand was to obtain the unredacted documentation that would allow the Court to calculate what portion of the total proceeds for various assignments from the FDIC was attributable to the loans in question. For example, some of the loans in question were sold as part of a bundle (5411 loans) to Rialto Capital on February 9, 2010 for $71.9 million, wherein the FDIC retained a 60% equity interest in the bundle. Def. Sent. Ex. 3.

The Government has provided no evidence, other than generalized statements that their loss figures account for the amount the FDIC received from the sale of the loans, that would allow the Court to reasonably estimate loss to the lender banks or FDIC. The offenses for which the Chrisleys were convicted did not *cause* the banks to fail and the FDIC to assign their loans. In fact, some of the loans that the FDIC sold were performing at the time of assignment. Without disclosure of the face value of other loans in the bundle, and whether the face value of the loans at issue in this case was impacted by the offense, the Government has failed its burden of proof with respect to whether the offense directly harmed any of the lender banks or the FDIC. Additionally, the Government has failed to disclosure the payments made

back to the FDIC by the assignees as division of profits in accordance with the FDIC's retained equity interest in the loans.

> ii. *The causal chain was broken by each bank's failure. Therefore, the offense did not proximately cause harm to the lender banks or FDIC.*

When determining whether an offense was the direct and proximate cause to the harm suffered by an alleged victim, the Government must establish "that the defendant is the but-for cause of the harm and that the connection is not too attenuated (either factually or temporally)." *United States v. Martin*, 803 F.3d 581, 594–95 (11th Cir. 2015) (citations omitted). Furthermore, the Supreme Court has held that there are a number of events that may "break the causal chain," including a victim's sale of collateral "to a friend for a nominal sum." *Robers v. United States*, 527 U.S. 639, 134 S.Ct. 1854, 1856, 188 L.Ed.2d 885 (2014). In this instance, the actual and proximate cause of any loss to the FDIC or the failed banks was the bank's failure itself. There is no question that in this situation, the FDIC would not receive the full value of the loans in question. However, there is absolutely no evidence that the bids for the bundle of loans were impacted by the offense itself.

While the Defendants contend causation has been broken as to the failed bank and/or FDIC's losses, in the event the Court does find actual and proximate cause for any harm to the FDIC or failed banks, it should take into account any sharp contrast between the fair market value of the loan at the time the FDIC sold it and

what it actually received for the sale. In other words, the bank's failure breaks the causal chain for at least a portion of its loss because the value of a failed bank's assets were substantially affected by the fact that the bank is under duress.

### b. For all bank loans, the Court can apportion liability for restitution to reflect the Julie Chrisley's level of contribution to the victim's loss.

In the case of a conspiracy, a "victim" under the MVRA includes "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). While an order of restitution is not discretionary under the MVRA in cases such as this, the Court has discretion of whether to make each defendant liable for the full amount of restitution or "apportion liability among the defendants to reflect the level of contribution to the victim's loss…" 18 U.S.C. § 3664(h).

Julie Chrisley was, at most, a minor participant in the bank fraud conspiracy and the bank loans cited in her Presentence Report predate any evidence of her involvement in the conspiracy. *See supra* Section III.b. As such, the Court should apportion restitution liability to reflect that Julie Chrisley was not even a member of the conspiracy at the time the loans were obtained.

Restitution for Todd Chrisley should be ordered as follows:

| Bank | Restitution | Explanation of differences between Defendant's Calculation and Government's Calculation in Gvt. Sent. Ex. 3 |
|------|-------------|----------------------------------------------------------------------------------------------------------------|
| Alpha Bank & Trust | $0.00 | - Loans 8000000, 8100000, and 820000 were obtained prior to "Date of Misrepresentation" (Gvt. Sent. Ex. 1, Rows 5-7). |

| | | |
|---|---|---|
| | | - Loans 70002141, 7002144, 7002198, and 7002357: No actual misrepresentation was shown (Gvt. Sent. Ex. 1, Rows 1-4).<br>- The basis for an additional $1,693,885.19 included in the restitution calculation classified as "Principal Recovered by 3rd Parties" is unclear. |
| Athens First Bank & Trust (Synovus) | $2,786,390.07 | *See* Def. Sent. Exhibit 1, Affidavit of Rhonda Smith at ¶¶ 27-33 for explanation of loss calculation. |
| Buckhead Community Bank (Cadence) | $0.00 | All loans obtained prior to "Date of Misrepresentation" (Gvt. Sent. Ex. 1, Rows 1-4). |
| Embassy Bank | $0.00 | Undisputed by the parties (PSR at ¶ 53) |
| Haven Bank (FDIC) | TBD | - Haven loans 700022353, 700022833, 700022841, and 700024581 were assigned to the FDIC. At this time, the Government has not provided reliable and specific evidence for loss on these loans, as it has not provided support for the amount the FDIC claims it received from the sale of these loans to LNV Corporation. *See supra* Section III.c.<br>- Loan 700024581 was obtained prior to the Date of Misrepresentation. (Gvt. Sent. Ex. 1, Row 20). |
| Haven Bank (FDIC/Res-GA) | TBD | - Haven loan 700024052 (mistakenly referred to as 700024581 in the PSRs) was assigned to the FDIC. At this time, the Government has not provided reliable and specific evidence for loss on this loan, as it has not provided support for the amount the FDIC claims it received from the sale of these loans to Res-GA and has not accounted for money for proceeds from the foreclosure and sale of property securing the loans. *See supra* Section III.c.<br>- The basis for an additional $219,835.00 included in the restitution calculation classified as "Principal Recovered by 3rd Parties" is unclear. |
| Integrity Bank (FDIC/Res-GA) | TBD | - Loans 400841700 and 400848200 were assigned to the FDIC. At this time, the Government has not provided reliable and specific evidence for loss on these loans, as it has not provided support for the amount the FDIC claims it received from the sale of these loans to Res-GA and has not accounted for money for proceeds from the foreclosure and sale of property securing the loans. *See supra* Section III.c.<br>- The basis for an additional $1,127,767.00 included in the restitution calculation classified as "Principal Recovered by 3rd Parties" is unclear. |

| Midtown Bank | $831,879.00 | - Loans 180161102 and 195161101 were obtained prior to "Date of Misrepresentation" (Gvt. Sent. Ex. 1, Rows 24-25).<br>- Remaining loan, 180161101, was secured by property located at 1067 Corsica Drive and 209 Belle Pines Ct.<br>- Midtown received $268,121 from the sale of property securing loan 180161101, so loss to Midtown is $831,879.00 ($1,100,000 - $268,121). (PSR at ¶ 71). |
|---|---|---|
| Regions Bank | $624,798.70 | |
| Security Bank | $0.00 | Undisputed by the parties (PSR at ¶ 78) |
| United Community Bank | $0.00 | Loans obtained prior to "Date of Misrepresentation" (Gvt. Sent. Ex. 1, Row 29) |
| **Restitution** | $4,243,067.77 | |

## IX.    Conclusion

As stated in the introduction to this Memorandum, the Government has vastly overstated the amounts of loss, restitution, and forfeiture that should be ordered by the Court. As set out in detail above, the Court should find that the appropriate loss, restitution, and forfeiture amounts are as follows:

| | **Todd Chrisley** | **Julie Chrisley** |
|---|---|---|
| **Actual Loss** | $4,243,067.77 | $0.00 |
| **Restitution** | $4,243,067.77 | $0.00 |
| **Forfeiture** | TBD | $0.00 |

Respectfully submitted this 16th day of November, 2022.

/s/ Arthur W. Leach

**Arthur W. Leach**
Georgia Bar No. 442025
The Law Office of Arthur W. Leach
4080 McGinnis Ferry Rd, Ste 401
Alpharetta, Georgia 30005
(404) 786-6443
Art@ArthurWLeach.com
*Counsel for Defendants*
*Todd and Julie Chrisley*

/s/ Laurabeth M. Wilson

**Laurabeth M. Wilson**
Georgia Bar No. 955623
The Law Office of Arthur W. Leach
4080 McGinnis Ferry Rd, Ste 401
Alpharetta, Georgia 30005
(205) 410-7782
LaurabethWilson@ArthurWLeach.com
*Counsel for Defendants*
*Todd and Julie Chrisley*

**Christopher S. Anulewicz**
Georgia Bar No. 020914
Balch & Bingham LLP
30 Ivan Allen, Jr. Blvd., N.W., Ste 700
Atlanta, Georgia 30308
Canulewicz@balch.com
(404) 261-6020
*Counsel for Julie Chrisley*

**Bruce H. Morris**
Georgia Bar No. 523575
Finestone, Morris, & White, LLC
Suite 2540 Tower Place
Atlanta, Georgia 30326
Bmorris@fmattorneys.com
(404) 262-2500
*Counsel for Todd Chrisley*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Motion was served on the following persons via the Court's Electronic Case Filing System on this 16th day of November, 2022.


/s/*Arthur W. Leach*