**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| | * | |
| v. | * | |
| | * | |
| TODD CHRISLEY, | * | 1:19-CR-00297-ELR-JSA |
| JULIE CHRISLEY, and | * | |
| PETER TARANTINO, | * | |
| | * | |
| Defendants. | * | |
| | * | |

_____

**O R D E R**

_____

On October 8, 2022, the Court denied Defendants Todd and Julie Chrisley's "Joint Motion for New Trial" [Doc. 258][1] and "Joint Motion for Judgment of Acquittal" [Doc. 260], as well as Defendant Peter Tarantino's "Rule 33 Motion for a New Trial" [Doc. 259]. [See Doc. 300 at 2]. At that time, the Court indicated that it would "fully set[] forth its reasoning and analysis regarding" these motions "at a later date." [See id. at 1]. Subsequently, on November 10, 2022, Defendants Todd and Julie Chrisley (the "Chrisley Defendants") filed a "Joint Motion for Reconsideration of Motion for New Trial and Motion for Sanctions" in which they

---

[1] The Court notes that Defendant Peter Tarantino moved to adopt this motion and the briefing Defendants Todd and Julie Chrisley submitted in support of it. [Doc. 296]. The Court granted Defendant Tarantino's request in that regard. [See Doc. 300 at 2]. Despite this fact and for ease of reference, the Court refers to the motion at Docket Entry 258 as the Chrisley Defendants' motion for new trial.

request that the "Court . . . reconsider its prior decision to deny the" Chrisley Defendants' motion for a new trial, "order a new trial[,] . . . [and] sanction" Assistant United States Attorneys Thomas Krepp and Annalise Peters—the Government's trial counsel in this case—"for their [alleged] lack of candor and attempts to mislead the Court."  [See Doc. 304].

Below, the Court "set[s] forth its reasoning and analysis" regarding the motions it previously denied as well as the Chrisley Defendants' subsequent motion for reconsideration.  [See Doc. 300 at 1].

## I.   The Chrisley Defendants' "Joint Motion for New Trial" [Doc. 258] and "Joint Motion for Reconsideration of Motion for New Trial and Motion for Sanctions" [Doc. 304]

By their original joint motion for a new trial, the Chrisley Defendants assert that they should be granted a new trial pursuant to Federal Rule of Criminal Procedure 33 because their original trial "was fundamentally unfair in two respects." [Doc. 258 at 1–2].  "First," they claim that "the [G]overnment presented and failed to correct false testimony from IRS Revenue Officer Betty Carter, who [allegedly] lied about the Chrisley[ Defendants] owing taxes for years when she knew no taxes were due."  [See id. at 2].  "Second," they assert that "the Court admitted substantial volumes of evidence at trial which were obtained in violation of the Fourth Amendment, even though this evidence had been suppressed under th[e] Court's prior rulings, without requiring the [G]overnment to make any showing at all that

the evidence should not be excluded." [See id.]  The Chrisley Defendants' motion for reconsideration of the Court's ruling on their motion for a new trial focuses solely on Officer Carter's testimony.  [See generally Doc. 304].  The Court begins by setting forth the legal standard for Rule 33 motions for a new trial.  It then evaluates the arguments the Chrisley Defendants make in both their original motion for a new trial and their motion for reconsideration of the same with respect to Officer Carter's testimony.  Finally, the Court considers their arguments regarding the purportedly wrongfully admitted evidence.

## A.    Legal Standard

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  FED. R. CRIM. P. 33(a).  The Eleventh Circuit has "defined the interest-of-justice standard as 'a broad'" one "that is not limited to cases where the district court concludes that its prior ruling, upon which it bases the new trial, was legally erroneous."  See United States v. Hatcher, No. 10-13544, 2011 WL 4425314, at *7 (11th Cir. Sept. 23, 2011) (quoting United States v. Vicaria, 12 F.3d 195, 198 (11th Cir. 1994)).  In other words, pursuant to Rule 33, a district court has the discretion to order a new trial where it concludes that the "circumstances" surrounding the first trial were "fundamentally unfair."  United States v. Martinez, 763 F.2d 1297, 1315 (11th Cir. 1985).

A Rule 33 motion for new trial based on the weight of the evidence should only be granted when "the 'evidence . . . preponderate[s] heavily against the verdict[] such that it would be a miscarriage of justice to let the verdict stand.'" United States v. Witt, 43 F.4th 1188, 1194 (11th Cir. 2022) (quoting Martinez, 763 F.2d at 1313). Thus, granting such a motion is appropriate "only in the rare case in which the evidence of guilt[,] although legally sufficient[,] is thin and marked by uncertainties and discrepancies." Id. In evaluating a Rule 33 motion for new trial based on the weight of the evidence, a court "may weigh the evidence and consider the credibility of the witnesses." Id. (quoting Martinez, 763 F.2d at 1312). "But Rule 33 isn't an invitation for the court to 'reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.'" Id. (quoting Martinez, 763 F.2d at 1312–13).

Regardless of their basis, "[m]otions for a new trial are highly disfavored" in the Eleventh Circuit. See United States v. Bogdan, 571 F. App'x 837, 839 (11th Cir. 2014) (internal quotation marks omitted). And "the defendant bears the burden of justifying a new trial." United States v. Thompson, 335 F. App'x 876, 879 (11th Cir. 2009) (quoting United States v. Campa, 459 F.3d 1121, 1151 (11th Cir. 2006) (en banc)). A district court's decisions regarding the merits of a motion for a new trial and whether to hold an evidentiary hearing regarding the same are committed to the trial judge's "sound discretion . . . and will not [be] reverse[d] . . . absent an

abuse of discretion."  See United States v. Mathurin, 750 F. App'x 871, 874 (11th

Cir. 2018); United States v. Garcia, 854 F.2d 1280, 1284 (11th Cir. 1988).

**B.     Purported Giglio and Brady Violations Related to Officer Carter's Testimony**

As noted, the Chrisley Defendants first argue that their trial was unfair

because IRS Revenue Officer Betty Carter falsely testified about the records she

reviewed in advance of trial and that the Chrisley Defendants still had balances with

the IRS for tax years 2014, 2015, and 2016.  [See Doc. 258 at 3–4, 9–11]; see also

Declaration of Denise Coxe ("Coxe Decl.") ¶ 30 [Doc. 304-1].  In their motion for a

new trial, the Chrisley Defendants contend that "the [G]overnment knowingly

condoned" this testimony in violation of the rules laid down by the Supreme Court

in Giglio v. United States and Napue v. Illinois.[2]  [See Doc. 258 at 9–11, 13] (citing

Giglio, 405 U.S. 150 (1972) and Napue, 360 U.S. 264 (1959)).  They take this

argument further in their motion for reconsideration.  They claim that AUSAs Krepp

and Peters knew from their work on this case over the course of six (6) years that the

Chrisley Defendants did *not* owe the IRS any money at the time of trial, but

nevertheless told Officer Carter to base any testimony she might give about the

---

[2] "In Napue. . . , the Supreme Court . . . [held] that due process is violated when the prosecutor obtains a conviction with the aid of evidence which he knows is false."  See Ross v. Heyne, 638 F.2d 979, 985 (7th Cir. 1980).  In Giglio, the Supreme Court "reaffirmed its holding in Napue and held that a defendant is entitled to a new trial if he can establish that the prosecutor intentionally or inadvertently failed to correct materially false testimony relevant to the credibility of a key government witness."  See id. at 986.  For ease of the reference, the Court refers to the supposed Giglio / Napue violation at issue here as a Giglio violation.

Chrisley Defendants' present balances with the IRS on information from the IRS Employee User Portal ("EUP"), which reflected that the Chrisley Defendants *did* owe the IRS for tax years 2014, 2015, and 2016, among others.  [See Doc. 304 at 13–15].

The Chrisley Defendants contend that Officer Carter's allegedly false testimony could have affected the jury's verdict in this case because it "went directly to the [D]efendants' character for truthfulness and to their intent to evade the payment of taxes—both key issues at trial" and that had they "been able to impeach Officer Carter's . . . testimony, it would have impugned the veracity of the [Government's] entire investigation" and trial presentation.  [See Doc. 258 at 11–16].  Separately, the Chrisley Defendants argue that the Government violated their constitutional rights (as established by the Supreme Court in Brady v. Maryland, 373 U.S. 83 (1963)) by not providing "defense counsel . . . [with] a copy of the information available on the [IRS] system" Officer Carter reviewed before she testified and by not disclosing during trial "emails between Officer Carter and [IRS] Special Agent [Brock] Kinsler . . . which [purportedly] contradicted Officer Carter's testimony." [See Doc. 258 at 16–18]; Declaration of Alex Little ("Little Decl.") ¶ 12 [Doc. 304-2].

In response, the Government argues that it did not violate Giglio because (1) "Officer Carter did not commit perjury" at trial; (2) even if Officer Carter's

testimony was false, the Chrisley Defendants "fail to establish that the prosecution team was aware of any perjury or failed to correct it[;]" and (3) even assuming the Government "knowingly suborned" Officer Carter's false testimony, the Chrisley Defendants "fail to meet their burden of establishing 'a reasonable likelihood that [such testimony] could have affected the judgment of the jury.'"  [See Doc. 292 at 13–25] (quoting United States v. Clarke, 442 F. App'x 540, 544 (2011)).   The Government further argues that it did not violate Brady because (1) "the Chrisley Defendants possessed the information they complain" was not properly disclosed to them, (2) "the jury was presented with the allegedly suppressed information[,]" and (3) the allegedly suppressed information was not material because the overall evidence against the Chrisley Defendants in this case was "overwhelming" and their convictions did not "hinge[] upon whether [they] paid their delinquent taxes from an evasion scheme that ended in 2018 by the start of trial in 2022."  [See id. at 25–30]. Below, the Court first provides an overview of Officer Carter's testimony and related events before explaining why there was no Giglio or Brady violation with respect to that testimony.

        1.    Relevant factual background

            a.    *Officer Carter's testimony at trial*

Officer Carter was called by the Government to testify as part of its case-in-chief.  See Trial Tr. Vol. 2 at 573:22–24 [Doc. 273].  She averred that, before her

testimony, she "review[ed] . . . IRS systems related to collections activity against the Chrisleys[,]" including "the case history where we keep our case inventory" as well the IRS' "integrated data system that will show returns that are filed, taxes that are due, payments that are made, basically the activity on the money side of the account."  See id. at 580:11–23, 584:16–585:6, 588:2–6.  She agreed that the materials she reviewed "refresh[ed] [he]r memory as to events that occurred while [she] w[as] assigned to the Chrisley case."  See id. at 580:24–581:1.  In a post-trial declaration, Office Carter clarified that

> [i]n preparing for [her] testimony, [she] reviewed the Integrated Collection System (ICS) history and the ICS archive history for the Chrisleys.  [She] also reviewed Employee User Portal (EUP) transcripts pulled under both Michael Todd Chrisley's [S]ocial [S]ecurity number and Julie Chrisley's [S]ocial [S]ecurity number.

Declaration of Betty M. Carter ("Carter Decl.") ¶ 6 [Doc. 292-3].

On direct examination, conducted on May 17 and 18, 2022, Officer Carter testified about her role as an IRS revenue officer, the tax collection process in general, and the IRS' efforts to collect unpaid taxes from the Chrisley Defendants, including several documents associated with that collection process.  See Trial Tr. Vol. 2 at 574:15–605:6; Trial Tr. Vol. 3 at 640:2–677:5 [Doc. 274]; [see also Docs. 211, 213].  This testimony included some discussion of balances the Chrisley Defendants owed the IRS as of various dates well before trial but did not address what, if any, balances the Chrisley Defendants owed the IRS at the time of trial.  See,

e.g., Trial Tr. Vol. 2 at 596:13–25; see also id. at 574:15–605:6; Trial Tr. Vol. 3 at 640:2–677:5.

The subject of the Chrisley Defendants' balances with the IRS as of the time of trial first arose during Officer Carter's cross-examination by Daniel Griffin, counsel for Defendant Tarantino, on May 18, 2022. See Trial Tr. Vol. 3 at 679:3–13. In relevant part, Officer Carter initially responded to Mr. Griffin's questions as follows:

> Q: You're a revenue officer who's looked at the filings in this case. Are you aware that tax returns were filed for those two years?
>
> A: Now they have been, yes.
>
> Q: Yes. And the amounts owed are zero. Did you know that?
>
> A: I'm not sure that's accurate.
>
> Q: The tax returns that were filed with the IRS—
>
> A: Which years are you talking about?
>
> Q: —for 2013 and 2014, the amount of tax owed by the Chrisleys is zero; did you know that?
>
> A: No, I did not.

Id. Later, during a line of questioning about Defendant Tarantino's contact with the IRS in September 2017 regarding the Chrisley Defendants' tax liability for 2013, 2014, and 2015, Mr. Griffin and Officer Carter had the following exchange:

> Q: Okay. Now, in 2014 there was a balance of about $77,000 that was fully paid; correct?
>
> A: 2014?

9

Q:     Yes.

A:     That's not accurate.

Q:     Okay.  Do you have your schedule there of payments and the like?

A:     No.

Q:     Okay.  We'll come back to that.

See id. at 705:5–706:7.  Later still, in a line of questioning about the Chrisley

Defendants' post-2017 payments to the IRS and their various properties on which

the IRS had tax liens, Officer Carter testified as follows:

Q:     . . . We talked about the three payments that were made on September 22nd, 2017.  You identified those?

A:     Yes.

Q:     Since that date, are you aware of the other payments that have been made?

A:     I am not, no.

Q:     You're not?

A:     No.

Q:     You just don't know?

A:     I don't know.

. . .

Q:     . . . Now, have you seen Todd and Julie Chrisley's 2010 joint return?

A:     I have not.

Q:     You've never seen it?

A:   No.

Q:   Oh, okay.  Have you seen Todd and Julie Chrisley's 2011 tax return?

A:   Not specifically, no.

Q:   Okay.

A:   I know they had balances owed, but I haven't seen the actual return.

Q:   Okay.  For 2010 are you aware now that there are no taxes owed?

A:   I'm not aware of that.  There is taxes owed.

Q:   Not on—you believe there is on 2010?

A:   I checked them yesterday morning.  Yes.

Q:   Okay.  On 2011, have you reviewed that return?

A:   I haven't reviewed the return.  I have, you know—we don't really review the actual return.  We'll review information about the return on our internal system.

See id. at 718:2–720:2.

The discussion of the Chrisley Defendants' balances with the IRS at the time of trial continued during Officer Carter's cross-examination by Bruce Morris, counsel for Defendant Todd Chrisley.  While reviewing a draft tax return for 2014, Officer Carter testified as follows:

Q:   This shows tax due of $235,327; right?

A:   Yes.

Q:   And this is for tax year 2014?

A:   Yes.

11

Q:   In fact, the final return for 2014 showed zero; correct?

A:   That's not accurate.

Q:   You don't believe that?

A:   I checked yesterday.  There is a balance owed for 2014.

Q:   No.  No.  The return, the return, the final return for tax year 2014 shows zero; is that correct?

A:   I don't know about the return.  I know there's an outstanding balance for 2014.

Q:   I'm asking you about the return for 2014.  Do you know or not that it's at zero?

A:   I don't know.

Q:   Certainly didn't show $235,327, did it?

A:   I don't know.

Q:   Don't know?

A:   I don't know.

See id. at 725:17–20, 727:4–728:10 (referencing [Doc. 247-62 at 6–8]).

The Government's redirect examination of Officer Carter focused on whether certain matters Defendants' counsel had asked about were within the scope of Officer Carter's job duties, communications Officer Carter had with Defendant Tarantino, summonses Officer Carter issued while working on the Chrisley Defendants' case, bank accounts associated with the Chrisley Defendants and various entities affiliated with them, and documents Officer Carter was shown on cross-examination.  See id. at 745:25–758:18, 760:25–767:7.  The Government did

not directly ask about any present balances the Chrisley Defendants owed the IRS, but it did give Officer Carter the opportunity to more fully explain what records related to those balances she reviewed in advance of her testimony:

> Q:   Now, you also said something about you checked yesterday morning.  And I believe there was a back and forth about what you were checking and all of that.  I want to give you an opportunity to complete your thoughts on that.
>
> A;   Yes.  I just went and checked on all outstanding balances.  And there are additional tax and penalties owed.
>
> Q:   To this day?
>
> A:   Yes.

See id. at 764:18–25.

On recross-examination, both Mr. Griffin (Defendant Tarantino's counsel) and Mr. Morris (Defendant Todd Chrisley's counsel) asked further questions about the Chrisley Defendants' current balances with IRS.  Specifically, Officer Carter had the following colloquy with Mr. Griffin:

> Q:   . . . I['ve] got to back up a little bit.  Earlier you said, I checked this morning and there's still money owed for 2010 and 2011.
>
> A:   Correct.
>
> Q:   And what my point is, is that can be—because the computer ran the interest and penalties after the payment was made or after the taxpayer was told how much to pay.
>
> A:   Could be.  Could be a lot of reasons.

See id. at 764:18–25.  Mr. Morris and Officer Carter then engaged in an extended

exchange about the Chrisley Defendants' current balances that began as follows:

> Q:    Ms. Carter, I think you just made a statement in response to Mr.
> Krepp's question that was different than the one I asked you, so
> let's see if we can straighten it out.
>
> A:    Okay.
>
> Q:    I think when I asked you, you said you didn't know what was
> owed in what year as of today.  Did you check in the meantime?
>
> A:    No.  I checked yesterday.  I think maybe what you're talking
> about there is, you were asking me specific information about
> what's on the return.
>
> Q:    Okay.  Let's get straight to the point.

See id. at 771:18–25.  After this introduction, Mr. Morris proceeded to ask Officer

Carter whether each of the Chrisley Defendants presently owed the IRS any money

for the tax years 2009 through 2016.  See id. at 771:23–775:7.  Officer Carter

testified that neither of the Chrisley Defendants owed for 2009, 2012, and 2013, but

that both owed for 2010, 2011, 2014, 2015, and 2016.  See id.  Mr. Morris asked

Officer Carter to "[t]ell [hi]m how much" was owed for the years the Chrisley

Defendants had a balance, because he believed the Chrisley Defendants' own

records indicated they had no outstanding balances.  See id.  Officer Carter testified

that the Chrisley Defendants owed "around [$]42,000" for 2014, but could not

provide approximate figures for 2010, 2011, 2015, and 2016.  See id.  She remarked

"I can't memorize all those numbers[,]" but she also testified that she could and would get "exact number[s]" if need be.  See id.

Following this testimony, Christopher Anulewicz, counsel for both Chrisley Defendants, and Mr. Morris asked Officer Carter about documents which appeared to show that as of July 2016 and December 2017, the Chrisley Defendants owed the IRS nothing for 2010; as of April 2016, they owed nothing for 2011; and as of May 2018, they owed nothing for 2014.   See id. at 775:8–779:21, 780:22–783:12 (referencing [Docs. 265-26, 265-55, 265-56, 265-57]).[3]  No counsel attempted to impeach Officer Carter's testimony about the balances the Chrisley Defendants owed the IRS as of the time of her testimony (i.e., May 2022).  During the remainder of trial, Officer Carter did not provide the Chrisley Defendants with further information about their present balances with the IRS for 2010, 2011, 2014, 2015, and 2016, and the Chrisley Defendants did not follow up with Officer Carter regarding the same.  [See Doc. 258 at 7] (the Chrisley Defendants' counsel representing to the Court that Officer Carter did not contact them following her trial testimony); see also Carter Decl. ¶ 9; Declaration of Bruce Seckendorf ("Seckendorf Decl.") ¶ 9 [Doc. 258-1] (both averring that the first interaction between the Chrisley

---

[3] The trial transcript references a "Defendant's Exhibit 70" being marked for purposes of identification and admitted into evidence on May 18, 2022.  See Trial Tr. Vol. 3 at 781:16–21. However, this appears to be an error.  There was no "Defendant's Exhibit 70" admitted on May 18, 2022.  [See Doc. 211].  And, based on Officer Carter's testimony, the document identified in the transcript as "Defendant's Exhibit 70" appears to be Defense Exhibit 702.  Compare Trial Tr. Vol. 3 at 781:16–782:6, [with Doc. 265-57].

Defendants and Officer Carter after Officer Carter's testimony was "[a]bout three weeks after trial").

> ### b.   *The Chrisley Defendants' mid-trial disclosure of post-2018 payment information and the Government's response*

The Government rested its case-in-chief on May 26, 2022.  <u>See</u> Trial Tr. Vol. 9 at 2318:3–4 [Doc. 280].  On May 31, 2022, the Chrisley Defendants disclosed a set of documents to the Government that they intended to use as exhibits during the testimony of Bill Salinski, the Chrisley Defendants' investigator who they called as a witness during their case-in-chief.  [<u>See</u> Doc. 292-1 at 2]; <u>see also</u> Trial Tr. Vol. 11 at 2929:4–20 [Doc. 282].  The documents included summaries of payments the Chrisley Defendants made to the IRS; account transcripts showing the Chrisley Defendants' transactions with the IRS; IRS payment receipts; bank records showing the Chrisley Defendants' payments to the IRS; and emails between Salinski and Trey Files, an accountant for the Chrisley Defendants.  [<u>See generally</u> Doc. 292-1].  Files stated in one of the emails that "[p]er info available to" the Chrisley Defendants on May 18, 2022, the Chrisley Defendants "should have minimal balances due [to the IRS,] if any."  [<u>See</u> <u>id.</u> at 40].

Apparently in response to the disclosure of these documents, on the evening of May 31, 2022, Special Agent Kinsler—a member of the prosecution team in this case—sent Officer Carter an email asking if she was able to tell Special Agent

Kinsler where a January 26, 2022 payment of $592,500 the Chrisley Defendants made to the IRS "went." [See Doc. 292-2 at 2–4]. The payment was made for taxes due for 2016. [See id. at 43]. Officer Carter responded that same evening that "the payment [wa]s sitting" under Defendant Todd Chrisley's Social Security number in the IRS' systems and, as such, was not applied to the Chrisley Defendants' joint tax return for 2016 because the joint return "was filed under [Defendant Julie Chrisley]'s SSN—she is primary." [See id. at 5]; see also Carter Decl. ¶¶ 7–8. There was no discussion between Special Agent Kinsler and Officer Carter regarding the Chrisley Defendants' balances for the 2014 and 2015 tax years. [See generally Doc. 292-2]. Special Agent Kinsler informed AUSAs Krepp and Peters about his email exchange with Officer Carter on the morning of June 1, 2022. [See Doc. 292 at 8 n.4] (AUSAs Krepp and Peters representing that Special Agent Kinsley remembers this conversation but that neither of them do).

### c.   *Subsequent events at trial*

The trial continued without the Government disclosing the May 31, 2022 email exchange between Special Agent Kinsler and Officer Carter to any Defendant. [See id. at 8]. On June 1, 2022, as part of Defendants' case-in-chief, Salinski testified about what the Chrisley Defendants' tax returns between 2009 and 2016 showed and the more than $2 million the Chrisley Defendants paid to the IRS over that period. See Trial Tr. Vol. 11 at 2936:25–2945:13 (referencing [Docs. 265-80,

265-81]).  The next day, on June 2, 2022, Bruce Seckendorf, a CPA who has done

tax work for the Chrisley Defendants since 2017, testified on behalf of

Defendants.  <u>See</u> Trial Tr. Vol. 12 at 3038:5–3040:19 [Doc. 283].  On direct

examination by the Chrisley Defendants' counsel, Seckendorf testified as follows:

> Q:     Now, have you been asked by the Chrisleys to determine what,
>        if any, tax obligations from 2009 through 2016 they currently
>        have with the IRS?
>
> A:     Yes.
>
> Q:     What have you, based upon your investigation, determined?
>
> A:     I personally have called the IRS at least six times.  Got a different
>        answer literally every time.  We've got balances due.  To my
>        knowledge, as of today, the IRS probably owes them a couple
>        thousand dollars at a minimum.  They're definitely overpaid for
>        2016 and prior.

<u>Id.</u> at 3048:21–3049:5.  All Parties concluded presenting evidence on June 2, 2022.

<u>See</u> <u>id.</u> at 3095:12–3096:3.

During its charge to the jury, read on the morning of June 3, 2022, the Court

instructed that "any later payment of tax does not erase the crime" of conspiracy to

defraud the IRS.  <u>See</u> Trial Tr. Vol. 13 at 3217:17–21 [Doc. 284].  However, the

Court added that

> evidence of tax filings or tax payment may be considered by you in
> determining whether in fact the defendants acted willfully to conspire
> to defraud the IRS or attempt to evade payment of tax.
>
> In determining a defendant's intent based upon their later filing of tax
> returns or tax payments, you may consider, among other things, what

they knew when they filed the tax returns and when the payment was
made.  Whether the defendants acted with the necessary criminal intent
is solely for you to determine based upon all of the evidence in the case.

Id. at 3218:1–10.  In their closing arguments, counsel for both Chrisley Defendants
made arguments regarding the Chrisley Defendants' purportedly full payment of
their tax liabilities as of the time of trial.  See id. at 3270:1–5, 3272:12–3273:7,
3288:3–23.  In contending that "there [wa]s no conspiracy among and between Mr.
Tarantino and the Chrisleys to cheat the Government or willfully evade paying
taxes," Mr. Morris (counsel for Defendant Todd Chrisley) argued that

the taxes were fully paid, penalties and interest.

Bruce Seckendorf told you they even overpaid a little bit.  Betty Car[ter]
said she thought maybe they owed something.  I said, how much?  She
said, I don't know.  I said, if you find evidence of that, please bring it
back and show us.  She didn't come back because they don't owe
anything.

It's not a crime that they were slow.  It's not a crime to rely on your
CPA and your attorney.  The judge will tell you it is a complete defense
to rely on the advice of your attorney and your CPA.

Maybe they should have paid sooner, but failing to pay on time is not a
crime. Should they have been penalized and charged interest?  Yes.
They were, and they paid it.  Do you have to agree that it was okay for
them to spend money on other things and not prioritize paying taxes?
No, you don't have to approve of that, but that is not a crime.  They are
charged with willful conduct.  And they did not in any way conspire
willfully to commit any criminal offense.

Id. at 3270:1–5, 3272:12–3273:7.    In its closing and rebuttal arguments, the Government did not address the issue of the Chrisley Defendants' subsequent payment of the balances they owed the IRS except as follows:

> Now, you heard in opening and then you heard again in closing that Chrisleys paid their money, they—you know, why are we here, the Chrisleys paid their taxes?  Well, you got a very specific instruction from the Court.  And you will have it when you go back.  If a person conspires to defraud the IRS or commits an act with the willful intent to evade the payment of tax, later crimes do not nullify the completed— later actions do not nullify the completed crime.  You can't rob a bank and return the money.  The crime happened, and you have to be held accountable.

See id. at 3325:14–23; see also id. at 3221:19–3256:11, 3312:18–3326:10.

### d.    Post-trial events

Following trial, Seckendorf "attempted to ascertain what tax liabilities the IRS believed the Chrisleys owed, if any, for all tax years through 2020."  See Seckendorf Decl. ¶ 7.  To that end, he communicated with Officer Carter in late June 2022, "[a]bout three weeks after trial."  See id. ¶¶ 9–12; Carter Decl. ¶¶ 9–10.  Based on these communications, it became clear that the Chrisley Defendants had no tax liability for 2014 and 2015 and that it appeared during trial that they did have liability for those years because their payments for the same were tied to Defendant Todd Chrisley's Social Security number instead of Defendant Julie Chrisley's Social Security number, though Defendant Julie Chrisley was the "primary filer" for the Chrisley Defendants' joint tax filings and payments associated with those joint

filings should have been made under her Social Security number.  See Declaration

of Cheryl Garcia ¶¶ 9, 11 [Doc. 292-4]; Seckendorf Decl. ¶¶ 12–17.  The balances

shown for 2010, 2011, and 2016 at the time of trial were not caused by the same

error, and the Chrisley Defendants fully paid those balances off in September 2022.

See Carter Decl. ¶ 14.

Having described Officer Carter's testimony and related events, the Court

now considers whether that testimony and the Government's actions related to it

resulted in a Giglio or Brady violation that rendered the trial in this matter

"fundamentally unfair."  See Martinez, 763 F.2d at 1315.

### 2.    The purported Giglio violation

"A Giglio error occurs when undisclosed evidence demonstrates that the

prosecution used perjured testimony and that the prosecution knew, or should have

known, of the perjury."  United States v. Duran, 486 F. App'x 768, 770 (11th Cir.

2012) (citing Ford v. Hall, 546 F.3d 1326, 1331 (11th Cir. 2008)).

> To prevail on a motion for a new trial claim based on a Giglio claim,
> the defendant "must establish that the prosecutor 'knowingly used
> perjured testimony, or failed to correct what he subsequently learned
> was false testimony,' and that the falsehood was material."  Tompkins
> v. Moore, 193 F.3d 1327, 1339 (11th Cir. 1999).  For the purposes of a
> Giglio claim, "the falsehood is deemed to be material if there is any
> reasonable likelihood that the false testimony could have affected the
> judgment of the jury."  Id.

Id. (emphasis omitted).  "Simply showing a memory lapse, unintentional error, or

oversight by [a] witness is insufficient" to make out a Giglio claim.  See Clarke, 442

F. App'x at 544 (citing <u>United States v. Bailey</u>, 123 F.3d 1381, 1396 (11th Cir. 1997)).  Additionally, "[t]he Supreme Court in <u>Giglio</u> was not deciding a case in which the defendant and defense counsel knew at trial that prosecution evidence was false."  <u>Ross</u>, 638 F.2d at 986.  Thus, there is no <u>Giglio</u> violation "if defense counsel is aware of" the false testimony that is the subject of a <u>Giglio</u> claim and "fails to object" to it during trial.  <u>See United States v. Stein</u>, 846 F.3d 1135, 1147 (11th Cir. 2017); <u>Routly v. Singletary</u>, 33 F.3d 1279, 1286 (11th Cir. 1994).

Here, as noted, the Chrisley Defendants ground their <u>Giglio</u> claim in Officer Carter's purportedly false testimony about (1) the records she reviewed in advance of trial and (2) the balances the Chrisley Defendants owed to the IRS as of the time of trial for tax years 2014, 2015, and 2016.  [See Doc. 258 at 3–4, 9–11]; <u>see also</u> Coxe Decl. ¶ 30.  Upon review, the Court finds that the Chrisley Defendants' <u>Giglio</u> claim is due to be denied for at least four (4) reasons.  First, some of the testimony the Chrisley Defendants challenge as false is objectively true.  Second, there is no evidence that either Officer Carter or the Government's lawyers knew that any of Officer Carter's testimony was false at any point during the course of trial.  Third, Officer Carter's testimony about the balances the Chrisley Defendants owed the IRS at the time of trial was not material to their convictions.  Fourth, the Chrisley Defendants knew of the inaccuracies in Officer Carter's testimony during trial but

failed to object to that testimony.  Below, the Court further elaborates on each of these reasons in turn.

> a.    *Two challenged portions of Officer Carter's testimony were true*

First, Officer Carter's testimony about the records she reviewed in advance of this case and about the Chrisley Defendants' balance with the IRS at the time of trial for tax year 2016 was truthful.  As to the testimony about Officer Carter's trial preparation, the Chrisley Defendants appear to argue that Officer Carter "stated that she had reviewed all the Chrisleys' tax accounts the day before" her testimony and that IRS "audit trail data makes clear that this statement was false."  See Coxe Decl. ¶ 30.  However, Officer Carter did not testify that "she had reviewed all the Chrisleys' tax accounts."  See id.  Instead, on direct examination, Officer Carter testified that she "review[ed] . . . IRS systems related to collections activity against the Chrisleys[,]" including "the case history where we keep our case inventory" as well the IRS' "integrated data system."  See Trial Tr. Vol. 2 at 580:11–23, 584:16–585:6, 588:2–6.  And, when elaborating on these statements during redirect, Officer Carter testified that she "checked on all outstanding balances[,]" not "all the Chrisleys' tax accounts[.]"  See Trial Tr. Vol. 3 at 764:18–25; see also Coxe Decl. ¶ 30.

Upon review, the Court finds that there is no evidence in the record contradicting this testimony or suggesting it is false or misleading.  Instead,

unrebutted record evidence shows that, before her testimony, Officer Carter accessed the IRS Integrated Data Retrieval System ("IDRS") through EUP, which is "[a] companion system to IDRS . . . that will generate a transcript upon request under a chosen Social Security [n]umber[.]"  Carter Decl. ¶ 6; Garcia Decl. ¶ 8.   The information Officer Carter would have seen on this system when searching by any given Social Security number includes "the date [a] return was received[;] the date it posted to IDRS[; and] any credits, payments, penalties and interest or tax adjustment increases or decreases" associated with that particular Social Security number.   Garcia Decl. ¶ 8.   This evidence is consistent with Officer Carter's testimony that she "review[ed] . . . IRS systems related to collections activity against the Chrisleys" and "checked on all outstanding balances[.]"[4]  See Trial Tr. Vol. 2 at 580:11–23, 584:16–585:6, 588:2–6; Trial Tr. Vol. 3 at 764:18–25.  Additionally, it is not contradicted by the audit trail evidence the Chrisley Defendants present to the Court in their motion for reconsideration.  Indeed, it is unclear to the Court whether the audit trail data that the Chrisley Defendants cite would capture activity on EUP because that system is apparently not the same as IDRS itself.  See Coxe Decl. ¶¶ 10–13 (describing audit trail data in general); see also Garcia Decl. ¶ 8 (noting that EUP is a "companion" system to IDRS).  Thus, the Court finds that the record evidence

---

[4] The Chrisley Defendants do not appear to contest the truthfulness of Officer Carter's testimony that she viewed the Chrisley Defendants' IRS "case history" in preparation for trial.  See Trial Tr. Vol. 2 at 580:15–19; [Doc. 304]; Coxe Decl.  For that reason, the Court does not address the truthfulness of that testimony here.

shows that Officer Carter's testimony about the records she reviewed to prepare for her testimony was truthful.

As to Officer Carter's testimony about 2016, the unrebutted evidence in the record demonstrates that the Chrisley Defendants did not pay off the balance they owed for that year until September 2022. See Carter Decl. ¶ 14(b) (noting that, on September 14, 2022, the Chrisley Defendants made a $3,287.55 payment for tax year 2016); Seckendorf Decl. ¶ 18 (acknowledging that the Chrisley Defendants owed for 2016 after the time of trial, likely for "interest and penalties that the IRS applied after receiving but not processing the payments"); see also Cox Decl. ¶ 42 (appearing to concede that payments the Chrisley Defendants "made in late 2021 and early 2022" did not "erase" all of their "2016 tax liability"). Thus, it logically follows that the Chrisley Defendants had a balance with IRS for tax year 2016 in May 2022 when Officer Carter testified and that her testimony to that effect was accurate. See id. Because Officer Carter's testimony about the records she reviewed in advance of trial and the Chrisley Defendants' balance for tax year 2016 was not false, it cannot sustain the Chrisley Defendants' Giglio claim. See Duran, 486 F. App'x at 770.

  b.  *Officer Carter and the Government's knowledge of the inaccuracies in Officer Carter's testimony during trial*

Though portions of Officer Carter's challenged testimony were accurate, others were revealed to be inaccurate after trial. Specifically, Officer Carter testified that, at the time of trial, the Chrisley Defendants owed "around [$]42,000" in unpaid

tax liability for 2014, plus an indeterminate amount for 2015.  <u>See</u> Trial Tr. Vol. 3 at 773:14:21, 774:12–20.  However, the Chrisley Defendants made payments to the IRS during late 2021 and early 2022 that resolved their outstanding balances for tax years 2014 and 2015.  <u>See</u> Garcia Decl. ¶ 11; Seckendorf Decl. ¶¶ 12–14. Nonetheless, the Court finds no evidence demonstrating Officer Carter was aware that her testimony regarding 2014 and 2015 was false at any time during trial. Instead, the Court finds that Officer Carter reasonably based her testimony on information she accessed via the IRS' internal EUP system, which, as of the time of trial, showed that the Chrisley Defendants had a "balance due" with the IRS "for each of" 2014 and 2015.  <u>See</u> Carter Decl. ¶ 6.  It was reasonable for Officer Carter to rely on this system because it pulls information from IDRS—the IRS' "master repository of all taxpayer account records"—and because it showed Officer Carter all the information she needed to know about the Chrisley Defendants' current status with the IRS, including "the date[s] the[ir] return[s] w[ere] received[;] the date [those returns] posted to IDRS[; and] any credits, payments, penalties and interest or tax adjustment increases or decreases" associated with the Chrisley Defendants' Social Security numbers.  <u>See</u> Garcia Decl. ¶¶ 7–8.  Further, the unrebutted testimony of career IRS revenue officer Cheryl Garcia shows the information the EUP system Officer Carter reviewed was flawed because of how the Chrisley

Defendants' payments were registered in the IRS' systems, not because of any negligence or willful blindness on Officer Carter's part.  See id. ¶¶ 3–4, 7–11.

The Chrisley Defendants assert that Officer Carter's testimony about their IRS balances for 2014 and 2015 must have been knowingly false because Officer Carter (and others) accessed the Chrisley Defendants' tax records on thousands of occasions during the years-long investigation preceding this trial such that members of the prosecution team, Officer Carter, or both would have seen that (1) at various times during the investigation, the IRS reported that the Chrisley Defendants did not owe anything for tax years 2014 and 2015 and (2) the Chrisley Defendants made payments to the IRS, including during late 2021 and early 2022, that eventually satisfied their tax obligations for tax years 2014 and 2015.  [See, e.g., Doc. 304 at 5, 12].  However, the Court is unpersuaded by this argument.  Even if the Chrisley Defendants had zero balances for tax years 2014 and 2015 at times prior to May 2022, this does not necessarily mean that their balances were zero as of May 2022.  Indeed, evidence in the record suggests that the amount a taxpayer owes the IRS can change after he or she makes what might have previously been a full payment "for a lot of reasons[,]" including, for example, because the IRS calculated the "interest and penalties [due] after the payment was made or after the taxpayer was told how much to pay."  See, e.g., Trial Tr. Vol. 3 at 770:20–771:3; see also Seckendorf Decl. ¶ 18.  And there is no evidence in the record that, at the time of trial, Officer Carter

27

was specifically aware of the late 2021/early 2022 payments the Chrisley Defendants made to the IRS for tax years 2014 and 2015.[5]  Instead, the Chrisley Defendants' arguments about Officer Carter's actual knowledge at the time of trial rests on their expert's speculation about what Officer Carter could or should have seen in the IRS' systems over the course of the six (6)-year investigation.  [See generally Doc. 304]; Coxe Decl.  Such speculation is insufficient to support the accusation that Officer Carter knowingly offered false testimony, and the Court declines to make such a finding.

Further, even if Officer Carter saw information indicating that the Chrisley Defendants owed nothing to the IRS for 2014 and 2015 as of May 2022, the Chrisley Defendants fail to offer evidence that suggests that Officer Carter lied under oath instead of simply misunderstanding or misremembering what she saw.  In this regard, the Court observes that Officer Carter's testimony was equivocal.  On more than one occasion, she stated that she could not recall or did not know specific details about what the Chrisley Defendants owed for various years and what payments they made.  See Trial Tr. Vol. 3 at 679:3–13, 718:2–720:2, 725:17–20, 727:4–728:10, 771:23–775:7.

_____

[5] Nothing about the emails exchanged between Officer Carter and Special Agent Kisler on May 18, 2022, changes the above analysis.  Those emails concerned a payment the Chrisley Defendants made for tax year 2016 and say nothing about the amounts the Chrisley Defendants owed for tax years 2014 and 2015.  [See Doc. 292-2 at 2–4].

In short, viewing the record evidence as a whole, the Court finds that Officer Carter's inaccurate testimony regarding the Chrisley Defendants' tax balances for 2014 and 2015 at the time of trial was the result of "a memory lapse, unintentional error, or oversight" and that neither Officer Carter nor AUSAs Krepp and Peters knew during trial that this testimony was inaccurate.  See Clarke, 442 F. App'x at 544.  Accordingly, Officer Carter's testimony regarding the Chrisley Defendants' outstanding tax liabilities for years 2014 and 2015 is "insufficient" to support their claimed Giglio violation.  See id.

Relatedly, the Court notes that there is no evidence to support the Chrisley Defendants' accusation that AUSAs Krepp and Peters coached Officer Carter to testify falsely.  [See Doc. 304 at 13–15].  This accusation is based on nothing more than speculation about the content of meetings between AUSAs Krepp and Peters and Officer Carter of which the Chrisley Defendants' counsel admit they have no evidence.  See 1/10/2023 Hr'g Tr. at 12:23–13:2 [Doc. 381].  The Court declines the Chrisley Defendants' invitation to hypothecate about the content of these conversations and, similarly, will not infer that serious ethical violations occurred in the absence of any supporting evidence.  [See generally Doc. 304]; Coxe Decl.

      *c.*     *Officer Carter's inaccurate testimony was not material to the Chrisley Defendants' convictions*

Next, the Court finds that Officer Carter's inaccurate testimony regarding tax years 2014 and 2015 was not material to the Chrisley Defendants' convictions, as it

must be to have caused a <u>Giglio</u> violation.  <u>See</u> <u>Duran</u>, 486 F. App'x at 770.  "For the purposes of a <u>Giglio</u> claim, '[a] falsehood is deemed to be material if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" <u>Id.</u> (quoting <u>Tompkins v. Moore</u>, 193 F.3d 1327, 1339 (11th Cir. 1999)). Here, the Chrisley Defendants argue that the jury would have viewed Officer Carter's testimony as less credible had they known that she testified falsely and that "Officer Carter's false testimony was exceedingly damaging to the[m]" because it "went directly to the [Chrisley D]efendants' character for truthfulness and to their intent to evade the payment of taxes—both key issues at trial." [<u>See</u> Doc. 258 at 13– 14].

Upon review, the Court finds that there is not "any reasonable likelihood" that Officer Carter's inaccurate testimony "could have affected the judgment of the jury." <u>See</u> <u>Duran</u>, 486 F. App'x at 770.  This is so because Officer Carter truthfully testified that, at the time of trial, the Chrisley Defendants owed balances to the IRS for tax years 2010, 2011, and 2016.  <u>See</u> Trial Tr. Vol. 2 at 771:23–775:7.  She further truthfully testified that the Chrisley Defendants did not owe the IRS any money for tax years 2009, 2012, and 2013.  <u>See</u> <u>id.</u>  Thus, the gravamen of Officer Carter's testimony was that, at the time of trial, the Chrisley Defendants owed the IRS for some years between 2009 and 2016, but did not owe the IRS for other years during that same period.  <u>See</u> <u>id.</u>  Accordingly, Officer Carter's incorrect testimony

regarding 2014 and 2015 did not affect the overall thrust of her testimony.  In other words, the Court finds that there is no material difference between testimony establishing that, at the time of trial, the Chrisley Defendants owed back taxes for five (5) out of eight (8) years as compared to testimony establishing that the Chrisley Defendants owed back taxes for three (3) out of the same eight (8) years.  In either instance, a jury could reasonably conclude that the Chrisley Defendants' failure to be totally current on their taxes more than five (5) years after those taxes were due was evidence of "their intent to evade the payment of taxes" or untruthfulness.  [See Doc. 258 at 13–14].  Further, the jury heard testimony at trial from two (2) defense witnesses (Salinski and Seckendorf) that contradicted Officer Carter's testimony about the back taxes the Chrisley Defendants owed.  See Trial Tr. Vol. 11 at 2936:25–2945:13; Trial Tr. Vol. 12 at 3048:21–3049:5.  Accordingly, the Court finds that it is not reasonably likely that the jury's views about the credibility of Officer Carter's testimony would have been significantly affected by the knowledge that her testimony was partially inaccurate.  For these reasons, the inaccuracies in Officer Carter's testimony were not sufficiently material to the Chrisley Defendants' convictions to support a Giglio violation.[6]  See Duran, 486 F. App'x at 770.

---

[6] The Court does not address the Chrisley Defendants' argument that Officer Carter's inaccurate testimony was material to "the credibility of the prosecution as a whole[,]" because as explained supra, there is no evidence AUSAs Krepp and Peters "were willing to encourage" Officer Carter "to mislead [the jury] and give partially true but wholly misleading testimony."  [See Doc. 304 at 22–23].

> d. *The Chrisley Defendants' failure to object to Officer Carter's testimony at trial*

Finally, Officer Carter's inaccurate testimony cannot constitute a <u>Giglio</u> violation because the Chrisley Defendants knew that it was inaccurate during trial and yet waited until after trial to object to it. As the Eleventh Circuit has repeatedly held, there is no <u>Giglio</u> violation "if defense counsel is aware of" the false testimony that is the subject of a <u>Giglio</u> claim and "fails to object" to it during trial. <u>See</u> <u>Stein</u>, 846 F.3d at 1147; <u>Routly</u>, 33 F.3d at 1286.

Here, the Chrisley Defendants and their counsel were aware that Officer Carter's testimony regarding tax years 2014 and 2015 was inaccurate. Specifically, an email received by a member of the Chrisley Defendants' legal team on May 18, 2022—the day that Officer Carter's testimony concluded—contained evidence showing that the Chrisley Defendants "should have minimal balances due [to the IRS,] if any" for tax years 2014 and 2015. [<u>See generally</u> Doc. 292-1]. The Chrisley Defendants also presented independent evidence about payments they made to the IRS and their outstanding balances through two (2) witnesses, Salinski and Seckendorf. <u>See</u> Trial Tr. Vol. 11 at 2936:25–2945:13; Trial Tr. Vol. 12 at 3048:21–3049:5.

And yet, despite knowing that Officer Carter's testimony regarding 2014 and 2015 was likely inaccurate in light of the payments the Chrisley Defendants made to the IRS, defense counsel failed to object to that testimony until filing the instant

post-trial motions.  [See Doc. 258].  The Chrisley Defendants did not, for example, recall Officer Carter to the stand to further cross-examine her regarding the payments the Chrisley Defendants made to the IRS, subpoena Officer Carter to reappear at trial with the records she believed supported her testimony that the Chrisley Defendants owed for 2014 and 2015, or alert the Court to the fact that Officer Carter's testimony was potentially inaccurate.  These failures preclude the Chrisley Defendants from arguing at this late stage that their trial was fundamentally unfair or constitutionally infirm based on Officer Carter's testimony.  See Stein, 846 F.3d at 1147; Routly, 33 F.3d at 1286.

### 3.    The purported Brady violation

Having addressed the purported Giglio violation, the Court turns to the supposed Brady violation.   A Brady violation occurs where the Government suppresses "evidence favorable to an accused" that "is material either to guilt or to punishment, irrespective of the" Government's "good faith or bad faith[.]"  Brady, 373 U.S. at 87.

> To establish a Brady violation, the defendant must show that (1) the government possessed favorable evidence to the defendant; (2) the defendant does not possess the evidence and could not obtain the evidence with any reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to the defendant, there is a reasonable probability that the outcome would have been different.

33

United States v. Vallejo, 297 F.3d 1154, 1164 (11th Cir. 2002). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985). As noted, the Chrisley Defendants argue that the Government violated Brady (1) by not providing "defense counsel . . . [with] a copy of the information available on the [IRS] system" Officer Carter reviewed before she testified and (2) by not disclosing during trial "emails between Officer Carter and [IRS] Special Agent [Brock] Kinsler . . . which [purportedly] contradicted Officer Carter's testimony." [See Doc. 258 at 16–18]; Little Decl. ¶ 12.

Here, the Court finds that the Chrisley Defendants' Brady claim fails on at least the second and fourth prongs. As noted supra, the Chrisley Defendants had evidence which their own accountant believed showed that they "should have [had] minimal balances due [to the IRS at the time of trial,] if any." [See generally Doc. 292-1]. Thus, any argument that the Government violated Brady by withholding evidence tending to show that the Chrisley Defendants were current on their taxes for 2009 to 2016 at the time of trial is meritless because that information "was equally available to the Government and the" Chrisley Defendants. See United States v. White, 846 F.2d 678, 692 (11th Cir. 1988); see also United States v. Catone, 769 F.3d 866, 871–72 (4th Cir. 2014) ("No Brady violation exists when the evidence

is available to the defense from other sources or through a diligent investigation by the defense." (internal quotation marks omitted)).

Independently, there is no "reasonable probability that the outcome would have been different" at trial if the Chrisley Defendants had access to evidence regarding the systems Officer Carter reviewed in preparation for her testimony and the emails she exchanged with Special Agent Kinsler on May 18, 2022. See Vallejo, 297 F.3d at 1164. Other evidence presented at trial tended to show that Officer Carter's testimony regarding the Chrisley Defendants' balances for 2014 and 2015 was inaccurate. See Trial Tr. Vol. 11 at 2936:25–2945:13; Trial Tr. Vol. 12 at 3048:21–3049:5. And the allegedly withheld evidence does not undercut the overall thrust of Officer Carter's testimony that the Chrisley Defendants owed the IRS for some years in between 2009 and 2016, but did not owe anything for other years during that same period. See supra I.B.2.c (the Court finding that the inaccuracies in Officer Carter's testimony were not sufficiently material to support a Giglio violation; Trepal v. Sec'y, Fla. Dep't of Corr., 684 F.3d 1088, 1108 (11th Cir. 2012) (explaining that "[t]he Giglio materiality standard is 'different and more defense-friendly' than the Brady materiality standard" (quoting United States v. Alzate, 47 F.3d 1103, 1109–10 (11th Cir. 1995))).

4.   The need for an evidentiary hearing

Finally, the Court finds that an evidentiary hearing would not aid it in adjudicating the Chrisley Defendants' motion for new trial. "[I]t is 'well established' in th[e Eleventh] Circuit that a district court may generally decide a motion for a new trial upon affidavits without an evidentiary hearing." United States v. Barton, 834 F. App'x 529, 530 (11th Cir. 2020) (quoting United States v. Hamilton, 559 F.2d 1370, 1373 (5th Cir. 1977)[7]). "Indeed, a district court has the discretion to deny an evidentiary hearing on a motion for a new trial if 'the acumen gained by a trial judge over the course of the proceedings makes her well qualified to rule on the basis of affidavits without a hearing.'" Id. (quoting United States v. Schlei, 122 F.3d 944, 994 (11th Cir. 1997)). Here, the Court finds that the "acumen" it "gained . . . over the course of the" years-long proceedings in this case "makes [it] well qualified to rule on" the Chrisley Defendants' motion for new trial "without a hearing." See id.

## C.    The Purportedly Improperly Admitted Evidence

The Chrisley Defendants' second asserted basis for a new trial is their claim that this Court admitted "substantial volumes of evidence" at trial in error. [See Doc. 258 at 19]. Specifically, the Chrisley Defendants contend that (1) a Court Order granting one of their suppression motions regarding evidence found as a result of an

---

[7] Decisions by the former Fifth Circuit issued before October 1, 1981, are binding as precedent in the Eleventh Circuit. See Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

unlawful search of one of their warehouses also suppressed substantial amounts of electronically stored information ("ESI") evidence as fruit of the poisonous tree obtained in violation of their Fourth Amendment rights, (2) the Chrisley Defendants' motion purportedly requesting that the Court "enforce" its previous suppression ruling was timely, and (3) this Court should have held an evidentiary hearing to both determine the scope of its Order granting the Chrisley Defendants' suppression motion and to require the Government to establish that the proffered ESI evidence qualified for an exception to the Fourth Amendment's exclusionary rule before admitting it at trial.  [See id. at 26–29].  The Court finds that none of these arguments support the contention that the Chrisley Defendants' trial was "fundamentally unfair" such that a new trial is justified.  See Martinez, 763 F.2d at 1315.  The Court discusses each of the Chrisley Defendants' arguments in turn.

> 1.    The suppression ruling

The Chrisley Defendants first argue that this Court failed to properly enforce its Order adopting Magistrate Judge Justin S. Anand's Report and Recommendation ("R&R") granting their motion to suppress physical evidence found at their warehouse (the "Warehouse R&R").  [See Doc. 258 at 27].  The Chrisley Defendants assert that the adopted Warehouse R&R also excluded much of the Government's ESI evidence, and therefore the Court erred in admitting this ESI evidence at trial. [See id.]  In response, the Government maintains that the Warehouse R&R did not

extend to the ESI evidence that the Chrisley Defendants unsuccessfully attempted to suppress by a separate motion.  [See Doc. 292 at 32].

The Chrisley Defendants' argument centers around the Warehouse R&R, which recommended the undersigned grant their motions to suppress physical evidence seized at one of their warehouses following a warrantless search by Georgia Department of Revenue ("DOR") agents.  [See Docs. 36, 41, 107].  Notably, Magistrate Judge Anand issued a different R&R recommending that this Court deny the Chrisley Defendants' separate motion to suppress the very ESI evidence at issue now (the "ESI R&R").  [See Docs. 52, 105].  In an Order dated January 26, 2022, this Court adopted both the Warehouse R&R and the ESI R&R, the latter over the Chrisley Defendants' objections.  [See Doc. 127].

The Court is not persuaded by the Chrisley Defendants' argument that the Warehouse R&R "extended far beyond the physical documents" seized by the Georgia DOR to include the separately challenged ESI evidence for at least three (3) reasons.  [See Doc. 258 at 22].  First, the Warehouse R&R makes no reference to any ESI evidence.  [See generally Doc. 107].  Second, the Chrisley Defendants argued for suppression of the ESI evidence by a separate motion, and Magistrate Judge Anand considered and rejected their arguments in the separate ESI R&R.  [See generally Docs. 52, 105].  This Court adopted Magistrate Judge Anand's ESI R&R and later confirmed that the ESI was "allowed into evidence at trial" as a result.  [See

Docs. 127; 183 at 3]. Finally, when this same issue arose at the pre-trial conference on April 14, 2022, the undersigned took the affirmative step of contacting Magistrate Judge Anand, who confirmed that the Chrisley Defendants did not argue that the ESI evidence should be suppressed in connection with or as fruit of the poisonous tree of the unlawful warehouse search. [See Doc. 193 at 51:16–25]. Therefore, in admitting the ESI evidence at trial, the Court did not fail to abide by its January 26, 2022 Order adopting Magistrate Judge Anand's Warehouse R&R.

2. The motion to establish admissibility

The Chrisley Defendants next argue that their "Motion to Require the United States to Establish Admissibility of Suppressed Evidence" [Doc. 162] was not a new and untimely motion, as this Court previously found, but was rather an attempt to enforce the Court's Order adopting the Warehouse R&R. [See Doc. 258 at 27–28]. Moreover, the Chrisley Defendants argue that the Government "waived" any timeliness argument regarding that motion, and, therefore, it was improper for the Court to bar the Chrisley Defendants' motion to establish admissibility as untimely. [See id. at 28].

As discussed above, by an Order dated April 19, 2022, the Court found that the Chrisley Defendants did not raise their argument that the ESI evidence was fruit of the poisonous tree of the unlawful warehouse search before Magistrate Judge Anand. [See Docs. 193 at 51:16–25; 183 at 3]. Therefore, the Chrisley Defendants'

motion to establish admissibility was not merely an attempt to "enforce" an existing Court order, but rather, was an effort to advance a new suppression argument.  [See Doc. 162].  Because the time to file motions in limine had passed, the Court properly held that the motion was untimely.  [See Docs. 143 (Order requiring motions in limine to be filed by March 21, 2022); 162 (the Chrisley Defendants' motion to establish admissibility, filed March 31, 2022); 183 at 3 (denying the motion as untimely)].

The Chrisley Defendants' contention that the Government waived any timeliness argument is similarly unpersuasive.  Nothing about the Government's conduct alters this Court's ability to enforce its own deadlines, including (as relevant here) its own deadline for motions in limine.  See FED. R. CRIM. P. 12(c)(1)–(3) (the Court may "set a deadline for the parties to make pretrial motions" and failure to abide by this deadline renders a motion "untimely"); United States v. Smith, 918 F. 2d 1501, 1509 (11th Cir. 1990) ("By failing to file his motion within the deadlines set by the court a defendant waives his right to assert this motion.").

The Chrisley Defendants assert that, even if this Court rightly construed their motion to establish admissibility as advancing a new suppression argument, it was not untimely because they demonstrated "good cause."  [See Doc. 294 at 14–15]. The Chrisley Defendants' purported "good cause" is that they "filed the motion just after the [G]overnment revealed its intention to admit the [ESI] evidence."  [See id.

at 14].  However, this argument is belied by the fact that the Chrisley Defendants moved to suppress the ESI evidence (an effort that was rejected by Magistrate Judge Anand and this Court) before they filed their motion to establish admissibility.  This timeline of events demonstrates that the Chrisley Defendants knew that the Government could use the ESI evidence at trial long before they filed their motion to establish admissibility.  Therefore, the Court did not err in denying the Chrisley Defendants' "Motion to Require the United States to Establish Admissibility of Suppressed Evidence" as untimely.  [Doc. 162].

3.    The denied request for an evidentiary hearing

Finally, the Chrisley Defendants argue that this Court erred when it declined to hold an evidentiary hearing on the merits of their motion to establish admissibility regarding the ESI evidence and require the Government to prove that such evidence fell within an exception to the Fourth Amendment's exclusionary rule.  [See Doc. 258 at 28–29].  As discussed above, the Chrisley Defendants' motion to establish admissibility of the ESI evidence was untimely, and the Court did not err in concluding that a hearing on the same was unnecessary.[8]  See Equity Lifestyle

---

[8] The Chrisley Defendants also contend that this Court "should still hold the evidentiary hearing in the interest of justice" because at some point in the future the Court will have to decide both if the ESI evidence was admissible as fruit of the poisonous tree (as their untimely motion to establish admissibility asserted) and if the Chrisley Defendants' counsel was constitutionally ineffective for failing to timely bring that argument.  [See Doc. 294 at 15].  The Court declines the Chrisley Defendants' invitation to hold an evidentiary hearing at this juncture and instead waits to address these issues until they are properly raised and considered by the Court of Appeals.

Props., Inc. v. Fla. Mowing & Landscaping Serv., Inc., 556 F.3d 1240, 1240–41

(11th Cir. 2009) ("A district court has inherent authority to manage its own docket"

and "need not tolerate defiance of reasonable orders").  Accordingly, the Court did

not err when it declined to hold an evidentiary hearing regarding the ESI evidence

and the scope of its January 26, 2022 Order adopting Magistrate Judge Anand's

Warehouse R&R.[9]

## II.     Defendant Tarantino's "Rule 33 Motion for a New Trial" [Doc. 259]

The Court next considers Defendant Tarantino's "Rule 33 Motion for a New

Trial." [Doc. 259].  Defendant Tarantino offers two (2) arguments in support of his

motion: (1) he "suffered compelling prejudicial spillover because" he was tried

jointly with the Chrisley Defendants and (2) "the evidence presented at trial weighs

heavily against [his] guilty verdict." [Doc. 259-1 at 2].  The Court has already set

forth the standard applicable to Rule 33 motions for a new trial and therefore turns

to address each of Defendant Tarantino's arguments in turn.  See supra part I.A.

### A.     The Joint Trial

First, Defendant Tarantino argues that this Court should grant him a new trial

because he suffered "compelling prejudicial spillover" as a result of the Court's

---

[9] The remainder of the Chrisley Defendants' arguments assert that the ESI evidence should not
have been admitted at trial because it does not qualify for any exception to the exclusionary rule
pursuant to the Fourth Amendment.  [See Doc. 258 at 29–35].  However, these arguments rely on
the Chrisley Defendants' incorrect theory that the ESI evidence was barred by the Warehouse R&R
as fruit of the poisonous tree—a theory they tried to advance for the first and only time through
their untimely motion to establish admissibility.

decision not to sever his trial from that of the Chrisley Defendants. [See Doc. 259-1 at 6]. Defendant Tarantino contends that he was prejudiced by the Court's decision to hold a joint trial because (1) the "overwhelming majority" of the Government's evidence was directed at the Chrisley Defendants and (2) the "nature" of the evidence directed at the Chrisley Defendants—purportedly unrelated to Defendant Tarantino—"inflamed the jury." [See id. at 15, 18]. In response, the Government argues that Defendant Tarantino only offers "conclusory assertions" in support of his argument that a joint trial was fundamentally unfair and that there is no indication that the jury was unable to follow the Court's instruction to make an individualized determination regarding Defendant Tarantino's guilt or innocence. [See Doc. 290 at 7].

A defendant seeking a new trial on the basis that his case should have been severed from those of his co-defendants or that his joint trial was improper must demonstrate "compelling prejudice." See United States v. Kabbaby, 672 F.2d 857, 861 (11th Cir. 1982); United States v. Pedrick, 181 F.3d 1264, 1266–67 (11th Cir. 1999). In this context, a court conducting the compelling prejudice analysis asks: "can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him?" Kabbaby, 672 F.2d at 861 (quoting United States v. Zicree, 605 F.2d 1381, 1389 (5th Cir. 1979)). There is no compelling prejudice when,

under all the circumstances of the particular case, as a practical matter, it is within the capacity of the jurors to follow the court's admonitory instructions and accordingly to collate and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct.

Id. (quoting Zicree, 605 F.2d at 1389).  In other words, to justify a new trial, the "prejudice flowing from a joint trial" must be to such an extent that it "is clearly beyond the curative powers of cautionary instruction."  United States v. Morrow, 537 F.2d 120, 136 (5th Cir. 1976).

The Court finds that Defendant Tarantino has not met his burden of demonstrating that his joint trial with the Chrisley Defendants resulted in compelling prejudice against him.   The Government's superseding indictment charged Defendant Tarantino with three (3) Counts: conspiracy to defraud the Internal Revenue Service ("IRS") (Count 8) and aiding in the filing of false tax returns with the IRS (Counts 10 and 11).  [See generally Doc. 130].  Defendant Tarantino moved to have his trial to be held separately from the Chrisley Defendants when these proceedings were before Magistrate Judge Anand.   [See Doc. 38].   Although Magistrate Judge Anand recommended that Defendant Tarantino's motion be granted, this Court disagreed.  [See Docs. 103, 127].  In rejecting Magistrate Judge Anand's recommendation and denying Defendant Tarantino's motion to sever, the Court found that the concerns that a joint trial raised here were "not unique" in the context of conspiracy cases, and the jury would be able to make individualized

determinations regarding the guilt or innocence of each Defendant. [See Doc. 127 at 4–5]. Indeed, the Court's instructions to the jury included the following:

> Although the Defendants are being tried together, you must give separate consideration to each Defendant. In doing so, you must determine which evidence in the case applies to a particular Defendant and disregard any evidence admitted solely against some other Defendants. The fact that you may find one of the Defendants guilty or not guilty should not control your verdict as to any other Defendants.

Trial Tr. Vol. 13 at 3193:12–18.

The Court agrees with the Government that Defendant Tarantino's arguments regarding compelling prejudice are conclusory. In his motion, Defendant Tarantino contends that only four (4) of the twenty-nine (29) Government witnesses were relevant to him and details examples of evidence purportedly directed solely at the Chrisley Defendants, such as that concerning the ownership of certain bank accounts, Defendant Julie Chrisley's wire fraud scheme, the Chrisley Defendants' bank fraud scheme, and the Chrisley Defendants' creation of fake invoices. [See Doc. 259 at 15–17]. Defendant Tarantino also highlights the testimony of Lindsie Chrisley and Donna Cash, who both allegedly "elicited a visceral, negative reaction from several members of the jury," as well as that of Alina Clerie, who purportedly "inflamed" the jury by testifying to the Chrisley Defendants' "extreme wealth." [See Doc. 259-1 at 15–20]. However, Defendant Tarantino fails to detail how any of this evidence amounts to compelling prejudice; instead, he only cites to the large amounts of evidence the jury was "tasked with sifting through"—and to the fact that

the jury found him guilty—to support his argument that "the jury simply aggregated the evidence and failed to meaningfully distinguish" between the Defendants' conduct. [See id. at 18–20].

To the contrary, as Defendant Tarantino concedes, "[i]n all joint trials, there will be evidence introduced against one defendant that does not apply to another defendant. That is inevitable." [Id. at 7]. And Defendant Tarantino does not identify anything that suggests that the jury was unable to "sift through the evidence [to] make an individualized determination as to each defendant." United States v. Cassano, 132 F.3d 646, 651 (11th Cir. 1998). Instead, this Court provided the jury with a limiting instruction, and the jury inquired about some specific pieces of evidence related to the Counts brought against Defendant Tarantino, suggesting that it carefully considered that evidence and how it related to Defendant Tarantino in particular. See Trial Tr. Vol. 13 at 3335:9–11; Trial Tr. Vol. 14 at 3345:19–21 [Doc. 285]; see also Zafiro v. United States, 506 U.S. 534, 539 (1993) (noting that limiting instructions will often cure any potential prejudice resulting from a joint trial). And, as explained in further detail below, the evidence presented against Defendant Tarantino at trial supported the jury's guilty verdict as to the Counts brought against him. Otherwise, Defendant Tarantino does not provide any indication that the jury aggregated evidence and witnesses specific to the Chrisley Defendants to his disfavor. Put simply, the mere fact that the jurors were present for the entirety of the

trial and found Defendant Tarantino guilty on the specific Counts with which he was charged does not amount to a showing of compelling prejudice.[10]

Because Defendant Tarantino offers only speculative, conclusory arguments that do not demonstrate that the jury was unable to "keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict," the Court finds that Defendant Tarantino did not suffer compelling prejudice by virtue of his joint trial with the Chrisley Defendants to a degree sufficient to grant his motion for a new trial.  See Kabbaby, 672 F.2d at 861.

## B.    The Weight of the Evidence

Defendant Tarantino next argues that the weight of the evidence presented at trial does not support a finding that he "knowingly and intentionally participate[d] in the conspiracy alleged in Count 8 and did not willfully aid and abet the filing of false returns as alleged in Counts 10 and 11."  [Doc. 259-1 at 22].  The Court addresses Defendant Tarantino's arguments with respect to Count 8 before turning to Counts 10 and 11.

---

[10] The primary case Defendant Tarantino relies on is inapposite.  [See Doc. 259-1 at 14] (citing Pedrick, 181 F.3d at 1268–73).  In Pedrick, the Eleventh Circuit affirmed the district court's grant of a new trial for one of the charged co-defendants in part because (1) the evidence against him was "minimal[,]" unlike the "overwhelming and vivid evidence" against the other defendants; and (2) there was "considerable direct evidence" that the co-defendant did not commit all of the eighty-nine (89) counts on which the jury convicted him.  See 181 F.3d at 1268–73.

1.   <u>Count 8</u>

In Count 8, Defendant Tarantino and the Chrisley Defendants were charged with "Conspiracy to Defraud the United States" in violation of 18 U.S.C. § 371 by using 7C's Productions to hide Defendant Todd Chrisley's income and by impeding the IRS' efforts to determine and collect the Chrisley Defendants' taxable income. [<u>See</u> Doc. 130 at 13–21]. Defendant Tarantino now argues that the evidence presented at trial does not support a finding that he possessed the requisite *mens rea* to be convicted of this crime, and he identifies evidence he believes demonstrates his lack of unlawful intent. [<u>See</u> Doc. 259-1 at 22]. In response, the Government contends that Defendant Tarantino minimizes the weight of the evidence against him. [<u>See</u> Doc. 290 at 8].

For Defendant Tarantino to have been properly convicted of the crime of "Conspiracy to Defraud the United States" as charged in Count 8, the Government must have proved that Defendant Tarantino (1) "agreed to impede the functions of the IRS," (2) "knowingly and voluntarily participated in that agreement," and (3) "committed an act in furtherance of the agreement[.]" <u>United States v. Hough</u>, 803 F.3d 1181, 1187 (11th Cir. 2015). "Participation in a conspiracy may be shown by direct or circumstantial evidence." <u>United States v. Gonzalez</u>, 810 F.2d 1538, 1542 (11th Cir. 1987).

Defendant Tarantino argues that the evidence presented shows that he did not "knowingly and voluntarily" participate in a conspiracy to defraud the IRS with the Chrisley Defendants.  [See Doc. 259-1 at 22].  He identifies several pieces of evidence that supposedly demonstrate that he acted "in good faith" to truthfully present information to the IRS, even if "sometimes incompetently" and "incorrectly."  [See id.]  In support of this argument, Defendant Tarantino cites to a transcript of a meeting with an FBI agent demonstrating Defendant Tarantino's "concern" with the Chrisley Defendants' tax delays, evidence showing his attempts to obtain relevant information for the Chrisley Defendants' tax returns, evidence demonstrating his compliance with Officer Carter's requests, the absence of evidence pointing to any concerted action between the Defendants, evidence of Defendant Tarantino's efforts to "determine the legitimacy of the Rialto Capital Deduction," the fact that the Chrisley Defendants' tax debts were purportedly incurred before Defendant Tarantino began working for them, and evidence of Defendant Tarantino providing supposedly factually true information during his interview with investigating agents regarding Defendant Todd Chrisley's income. [See id. at 23–25].

The Court finds that the weight of the evidence presented at trial supports the jury's conviction of Defendant Tarantino on Count 8.  At trial, Officer Carter testified that Defendant Tarantino acted as the Chrisley Defendants' power of

attorney, had access to their 7C's Productions bank account, and knew about the Chrisley Defendants' unpaid tax debt.  <u>See</u> Trial Tr. Vol. 3 at 640:20–645:7, 750:19–753:24;  [Doc. 263-238].  IRS Revenue Officer Agnes Jagiella testified at trial that Defendant Tarantino lied to her regarding the ownership of 7C's Productions.  <u>See</u> Trial Tr. Vol. 3 at 785:18–789:5; [Doc. 263-237].  Similarly, IRS Special Agent Stephen Ryskoski testified at trial that Defendant Tarantino lied to him regarding Todd Chrisley's income from 7C's Productions.  <u>See</u> Trial Tr. Vol. 5 at 1089:23–1100:19 [Doc. 276].  The Government produced evidence that Defendant Tarantino provided purported copies of the Chrisley Defendants' tax returns to third parties knowing that such returns had never been filed with the IRS.  <u>See</u> Trial Tr. Vol. 3 at 645:8–651:7, 829:4–832:21; Trial Tr. Vol. 5 at 1108:3–1111:22; [Docs. 263-198, 263-211, 263-213, 263-214].   And trial testimony and documentary evidence supported the idea that Defendant Tarantino acted at the direction of and in concert with the Chrisley Defendants.  <u>See</u> Trial Tr. Vol. 3 at 830:5–832:21; Trial Tr. Vol. 5 at 1096:24–1097:21; [Doc. 263-241].  This direct and circumstantial evidence was sufficient for the jury to find Defendant Tarantino guilty on Count 8 for knowingly participating in a conspiracy to defraud the IRS with the Chrisley Defendants.  <u>See</u> <u>Martinez</u>, 763 F.2d at 1313 (discussing that a Rule 33 motion for new trial should be granted only where the "evidence . . . preponderate[s] heavily against the verdict[] such that it would be a miscarriage of justice to let the verdict stand").

2.    Counts 10 and 11

In Counts 10 and 11, the Government charged Defendant Tarantino with two (2) Counts of aiding in the filing of a false tax return in violation of 26 U.S.C. § 7206(2).  [See Doc. 130 at 23–24].  These two (2) Counts concern the 2015 and 2016 tax returns Defendant Tarantino prepared on behalf of 7C's Productions claiming that the company did not generate revenue or make distributions in those years.  [See id.]  In his motion, Defendant Tarantino argues that "he did not file willfully false returns, but rather filed returns with the intent to later amend" them. [Doc. 259 at 27].

The Court finds that the weight of the evidence presented at trial supports Defendant Tarantino's convictions on Counts 10 and 11.  At trial, the Government presented evidence demonstrating both that the 2015 and 2016 tax returns prepared on behalf of 7C's productions by Defendant Tarantino were false and that Defendant Tarantino knew those returns were false.  See Trial Tr. Vol. 5 at 1098:5–1107:6. Indeed, Defendant Tarantino's signature appears on these tax returns as the preparer, and he had access to the bank accounts where the income for 7C's Productions was deposited.  See id.; [Docs. 263-4,  263-6, 263-238].  This evidence was sufficient for the jury to find that Defendant Tarantino willfully aided the Chrisley Defendants in filing false tax returns on behalf of 7C's Productions for the 2015 and 2016 tax years. Accordingly, the Court denies Defendant Tarantino's Rule 33 motion.

**III.    The Chrisley Defendants' "Joint Motion for Judgment of Acquittal" [Doc. 260]**

The Court concludes with the Chrisley Defendants' "Joint Motion for Judgment of Acquittal." [Doc. 260].  In that motion, the Chrisley Defendants contend that "the Court should enter a judgment of acquittal for Counts 2 through 9 for Julie Chrisley and Counts 3, 5, 6, 8, and 9 for Todd Chrisley" pursuant to Federal Rule of Civil Procedure 29 because "the [G]overnment failed to meet its evidentiary burden on these [C]ounts."[11]  [Id. at 3].  The Court sets forth the relevant legal standard before applying it to the Parties' arguments.

**A.    Legal Standard**

"Pursuant to Federal Rule of Criminal Procedure 29, a district court may set aside a guilty verdict and enter judgment of acquittal if there is insufficient evidence to sustain the verdict."  United States v. Williams, 390 F.3d 1319, 1324 (11th Cir. 2004).  Evidence is considered insufficient to sustain a guilty verdict where "the prosecution has failed to prove guilt beyond a reasonable doubt."  United States v. Martin, 803 F.3d 581, 587 (11th Cir. 2015) (internal quotation marks omitted) (quoting Burks v. United States, 437 U.S. 1, 16 n.10 (1978)).  The court "will not overturn a jury's verdict if there is 'any reasonable construction of the evidence that

---

[11] In their Rule 29 motion, the Chrisley Defendants do not challenge their convictions on Count 1. [See generally Doc. 260].  Nor do they challenge Defendant Todd Chrisley's convictions on Counts 2, 4, or 7.  [Id.]

would have allowed the jury to find the defendant guilty beyond a reasonable doubt.'" Id. (alteration adopted) (quoting United States v. Friske, 640 F.3d 1288, 1291 (11th Cir. 2011)).  Put differently, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." See Jackson v. Virginia, 443 U.S. 307, 326 (1979) (emphasis in original); see also United States v. Almanzar, 634 F.3d 1214, 1221–22 (11th Cir. 2011) ("a conviction may not be disturbed 'on the ground of insufficient evidence unless no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'" (quoting United States v. U.S. Infrastructure, Inc., 576 F.3d 1195, 1203 (11th Cir. 2009))).

In determining the sufficiency of the evidence, courts must "view the evidence in the light most favorable to the [G]overnment." See Almanzar, 634 F.3d at 1221–22; see also Williams, 390 F.3d at 1323 (same).  To that end, courts in the Eleventh Circuit "resolve any conflicts in the evidence in the Government's favor." United States v. Macko, 994 F.2d 1526, 1528 (11th Cir. 1993) (citing United States v. Burns, 597 F.2d 939, 941 (5th Cir. 1979)).  "The test for sufficiency of the evidence is identical, regardless of whether the evidence is direct or circumstantial[.]" See Martin, 803 F.3d at 587 (cleaned up) (quoting United States v. Mieres–Borges, 919 F.2d 652, 656–57 (11th Cir. 1990)); see also Macko, 994 F.2d at 1528 ("The same

test applies whether the evidence is direct or circumstantial." (internal quotation marks omitted) (quoting <u>Burns</u>, 597 F.2d at 941)).

"A jury is free to choose among reasonable constructions of the evidence" presented at trial. <u>See</u> <u>Williams</u>, 390 F.3d at 1323 (citing <u>United States v. Vera</u>, 701 F.2d 1349, 1357 (11th Cir. 1983)); <u>see also</u> <u>Almanzar</u>, 634 F.3d at 1221 ("The jury is free to choose among reasonable inferences to be drawn from the evidence presented at trial[.]" (citing <u>United States v. Molina</u>, 443 F.3d 824, 828 (11th Cir. 2006))).  "Thus, it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." <u>Williams</u>, 390 F.3d at 1323–24 (internal quotation marks omitted and cleaned up) (quoting <u>United States v. Young</u>, 906 F.2d 615, 618 (11th Cir. 1990)); <u>accord</u> <u>United States v. Calderon</u>, 127 F.3d 1314, 1324 (11th Cir. 1997) (same); <u>Macko</u>, 994 F.2d at 1532 (same).  It is well-established that "the court must accept all reasonable inferences and credibility determinations made by the jury." <u>See</u> <u>Macko</u>, 994 F.2d at 1532 (internal citation omitted); <u>see also</u> <u>Almanzar</u>, 634 F.3d at 1221 ("the district court must accept all reasonable inferences and credibility determinations made by the jury" (citing <u>Molina</u>, 443 F.3d at 828)); <u>Williams</u>, 390 F.3d at 1323 ("All credibility choices must be made in support of the

jury's verdict." (citing <u>United States v. Greer</u>, 850 F.2d 1447, 1450 (11th Cir. 1988))).

In sum, when ruling on a Rule 29 motion, the district court must view the evidence in the light most favorable to the Government, "giv[e] full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact," and then "determine whether . . . a reasonable mind might fairly conclude guilt beyond a reasonable doubt." <u>Curley v. United States</u>, 160 F.2d 229, 232 (D.C. Cir. 1947). "The judge's function is exhausted when [s]he determines that the evidence does or does not permit the conclusion of guilt beyond reasonable doubt within the fair operation of a reasonable mind." <u>Id.</u>

**B.     Discussion**

Having set forth the relevant legal standard, the Court applies it to the Counts challenged by the Chrisley Defendants' Rule 29 motion. The Court begins its discussion with the arguments that apply to Defendant Julie Chrisley individually before turning to the issues that apply to the Chrisley Defendants jointly.

1.     <u>Defendant Julie Chrisley</u>

a.     *Counts 2 through 6—Bank fraud*

The Chrisley Defendants argue that the Government failed to present sufficient evidence to prove beyond a reasonable doubt that Defendant Julie Chrisley

knowingly participated in the scheme to commit bank fraud through false pretenses, representations, or promises.  [See Docs. 260 at 4–5; 295 at 1–3].  As relevant here,

> . . . to convict a defendant of bank fraud pursuant to 18 U.S.C. § 1344(2), the Government must prove beyond a reasonable doubt[] that: (1) a scheme existed to obtain money, funds, or credit in the custody of a federally insured financial institution; (2) the defendant participated in the scheme by means of false pretenses, representations, or promises, which were material; and (3) the defendant acted knowingly.  United States v. Dennis, 237 F.3d 1295, 1303 (11th Cir. 2001).  Likewise, to be convicted of aiding and abetting bank fraud, the Government must demonstrate that the Defendant had the same willfulness and unlawful intent as the actual perpetrators of the fraud, that is, she acted with the intent to defraud.  United States v. Perez, 922 F.2d 782, 785 (11th Cir. 1991).

Williams, 390 F.3d at 1324 (internal footnote omitted).

"A scheme to defraud requires proof of a material misrepresentation, or the omission or concealment of a material fact calculated to deceive another out of money or property."  United States v. Maxwell, 579 F.3d 1282, 1299 (11th Cir. 2009) (citing United States v. Svete, 556 F.3d 1157, 1161, 1169 (11th Cir. 2009) (en banc)).  A misrepresentation is material where it "has a natural tendency to influence, or is capable of influencing, the decision maker to whom it is addressed."  Id. (cleaned up).

Notably, "[w]hile the Government must show intent [to defraud], it need not show [the] [d]efendant's knowledge of the particular means the principals employed to carry out the criminal activity."  See Williams, 390 F.3d at 1324 n.4; see also Perez, 922 F.2d at 785 (internal citations omitted) (instructing that "the

[G]overnment need not show that [the defendant] had knowledge of the particular means his principals employed to carry out the criminal activity" but must show that the defendant "had the same unlawful intent as the actual perpetrators"). "A jury may infer an intent to defraud from the defendant's conduct." Maxwell, 579 F.3d at 1301 (citing United States v. Hawkins, 905 F.2d 1489, 1496 (11th Cir. 1990)). "An intent to defraud may be found when the defendant believed that [s]he could deceive the person to whom [s]he made the material misrepresentation out 'of money or property of some value.'" Id. (quoting United States v. Cooper, 132 F.3d 1400, 1405 (11th Cir. 1998)). Additionally, "[c]ircumstantial evidence may prove knowledge and intent." See Macko, 994 F.2d at 1533 (11th Cir. 1993) (internal citation omitted); see also Maxwell, 579 F.3d at 1299 ("circumstantial evidence can supply proof of knowledge of the scheme" (citing United States v. Ellington, 348 F.3d 984, 989–90 (11th Cir. 2003))).

In the instant motion, the Chrisley Defendants do not challenge the first of the three (3) elements necessary to convict a defendant for bank fraud: the existence of a scheme or schemes targeting federally insured financial institutions. [See generally Docs. 260, 295]. Rather, they argue that the Government failed to offer any evidence regarding the second and third elements, specifically, "that [Defendant Julie] Chrisley ever made any false statements to the banks specifically named in these counts, intended to deprive those banks of their property, . . . otherwise

participated in any scheme to defraud any of these banks" or "that she directed anyone to do so."  [Doc. 260 at 5].  In response, the Government lists several examples of evidence from trial to support that it "proved beyond a reasonable doubt that [Defendant] Julie Chrisley was a knowing participant in the bank fraud scheme." [Doc. 289 at 9].  Additionally, the Government argues that it was not required to "prove [Defendant Julie Chrisley's] personal participation involvement in every act committed in furtherance of the scheme[]" and highlights that Defendant Julie Chrisley "does not challenge her conviction on the bank fraud conspiracy (Count One)."  [Id. at 9 & n.2].

Here, the Court finds that the Government presented ample evidence that Defendant Julie Chrisley knowingly made material misrepresentations to banks as part of a fraudulent scheme to obtain funds for her personal benefit.  As the Government details in its response brief, Mark Braddock testified that he and the Chrisley Defendants "were all three involved" in the scheme to defraud banks.  See Trial Tr. Vol. 6 at 1468:9–10 [Doc. 277]; [see also Doc. 289 at 6].  The Government presented evidence that Defendant Julie Chrisley was aware that Braddock inflated her own assets on personal finance statements ("PFS") for submission to banks and that she even used some of the same inflated asset figures later when filling out fraudulent financial documents herself.  See, e.g., Trial Tr. Vol. 6 at 1522:6–1523:6. Additionally, the Government's evidence at trial supports the fact that both Chrisley

Defendants and Braddock corresponded about and collaborated in creating falsified records to submit to banks; indeed, at times, Defendant Julie Chrisley directly gave the direction to falsify certain documents for the purposes of obtaining approval on loans.  See, e.g., id. at 1539:9–1542:1.

Further, "a defendant is liable for reasonably foreseeable acts of others committed in furtherance of the conspiracy of which the defendant has been convicted."  United States v. Alas, 196 F.3d 1250, 1251 (11th Cir. 1999) (internal quotation marks omitted) (quoting United States v. Davis, 117 F.3d 459, 463 (11th Cir. 1997)).  It is undisputed that Defendant Julie Chrisley was convicted on Count 1 for conspiracy to commit bank fraud, and she does not challenge that conviction in the instant motion.  This fact, in combination with the above-cited evidence, makes clear that the jury acted reasonably in convicting Defendant Julie Chrisley of the substantive crime of bank fraud because such fraud fell "within the scope" of the Chrisley Defendants' unlawful conspiracy to defraud the banks and was "a necessary or natural consequence" of that conspiracy.  See United States v. Mothersill, 87 F.3d 1214, 1218 (11th Cir. 1996).

Although the Chrisley Defendants urge the Court to disregard the testimony of Braddock regarding Defendant Julie Chrisley, the Court is "required to resolve any conflicts in the evidence in favor of the Government and accept all reasonable inferences that tend to support the Government's case."  Williams, 390 F.3d at 1324

(citing United States v. Ward, 197 F.3d 1076, 1079 (11th Cir. 1999)).  The "jury was free to disbelieve [Braddock's] testimony" at trial and to "choose among reasonable constructions of the evidence" in rendering its verdict.  See id. at 1323, 1325 (internal citations omitted).  The Court finds that the jury chose a reasonable construction of the evidence in finding Defendant Julie Chrisley guilty of Counts 2 through 6. Accordingly, the Court denies the Chrisley Defendants' Rule 29 motion as to the same.

### b.    Count 7—Wire fraud

Count 7 charges Defendant Julie Chrisley with committing wire fraud during the lease application process for a luxury home in California that she rented for herself and Defendant Todd Chrisley.  [See Doc. 130 at 11–13].  The Chrisley Defendants contend that "the [G]overnment produced no evidence from which a reasonable juror could find that Julie Chrisley made *material* misrepresentations . . . through an interstate wire[,]" and that, therefore, the Court should enter a judgment of acquittal on Count 7.  [Doc. 260 at 12] (emphasis added).

"A conviction for wire fraud requires evidence the defendant (1) intentionally participated in a scheme to defraud another of property or money and (2) used or caused the use of wires to execute the scheme to defraud."  United States v. Franklin, No. 21-14358, 2022 WL 5337453, at *3 (11th Cir. Oct. 7, 2022) (citing 18 U.S.C. § 1343 and United States v. Ward, 486 F.3d 1212, 1222 (11th Cir. 2007)).

Similar to the offense of bank fraud, wire fraud "requires proof of a material misrepresentation, or the omission or concealment of a material fact[,]" and a fact is material "if it has a natural tendency to influence, or is capable of influencing, the decision maker to whom it is addressed[.]" See Maxwell, 579 F.3d at 1299 (cleaned up). "Because the focus of the [wire] fraud statute, like any criminal statute, is on the violator, the purpose of the element of materiality is to ensure that a defendant actually intended to create a scheme to defraud." Svete, 556 F.3d at 1165. Thus, "proof of" the defrauded party's reliance on the misrepresented fact "is not necessary to establish materiality if the defendant knows or should know that the victim is likely to regard the misrepresented facts as important." Id.

As context, during July 2014, Defendant July Chrisley applied to lease a luxury home in California with a monthly rent of $13,500. See Trial Tr. Vol. 6 at 1639:11–13. The owner of the California rental home hired a real estate agent named Adam Jaret to be the listing agent for the home. See id. at 1364:21, 1366:3–22. At trial, Jaret testified that the lease application process for the home was "standard" and involved verifying an applicant's available funds, obtaining a credit report, and sometimes collecting other information about an applicant online or from references, at which point Jaret would "present that all to [his] client[,]" the homeowner. See id. at 1370:22–1371:3.

61

Jaret testified that the foregoing pieces of information are necessary for the lease application process and "[n]eed[] to be 100 percent accurate" because if a potential renter does not have sufficient available funds "and the credit [score] is not good, [Jaret] would not recommend [that his] client" lease the property to that applicant. See id. at 1382:4–18. Although the homeowner ultimately made the decision as to whether to lease the California rental home to Defendant Julie Chrisley, Jaret acted as the homeowner's representative and used his real estate expertise to assess the documentation Defendant Julie Chrisley provided during the lease application process. See id. at 1382:19–25. When asked what he "would be looking for in terms of verification of funds" for the California rental home, Jaret answered that a qualified applicant would have approximately two (2) to four (4) times the amount of yearly rent in readily available funds (here, approximately $400,000). See id. at 1371:8–15. He further testified that a credit report was necessary because a qualified lease candidate would have a credit score higher than 700. See id. at 1372:4–7.

When Defendant Julie Chrisley applied to lease the California rental home, her own real estate agent, Santiago Arana, and Arana's assistant, Raini Casados, provided the verification of funds documents and a credit report to Jaret, although Jaret testified that it was "not an easy process to obtain the requested documents" and that he had to request the verification of funds "multiple times[.]" Id. at

1382:20–25.  The first verification of funds document Jaret received on behalf of

Defendant Julie Chrisley was a checking statement for an account belonging to 7C's

Productions (at City National Bank) that held roughly $86,000.  See id. at 1382:24–

1383:3.  The California homeowner and Jaret "both agreed, that's not enough"

available funds to lease the home, given its level of monthly rent.  See id.  Jaret

conveyed this by email (to Casados, who forwarded the message to the Chrisley

Defendants) and requested additional verification of funds since the balance in the

account provided was too low to be satisfactory.  See id. at 1377:23–1378:2.  In

response, Defendant Julie Chrisley sent a PDF of a BB&T account statement that

herself listed as the account holder and showed an available balance of

approximately $419,738.85—enough available funds to make her a qualified

applicant for the California rental home.  See id. at 1371:8–15, 1380:10–1381:24.

As for her credit report, Defendant Julie Chrisley provided a purported

Equifax credit report to Jaret, through Casados, showing her credit score was in the

high 700s to low 800s.  See id. at 1375:1–6.  Jaret indicated that "Julie's credit looks

great" in response to Casados upon receiving the credit report.  See id. at 1378:4.

Defendant Julie Chrisley was ultimately able to rent the home, although she failed

to timely pay rent within a mere matter of months.  See id. at 1385:19–1386:25.

Upon consideration, the Court finds the evidence at trial was sufficient for the

jury to convict Defendant Julie Chrisley of wire fraud in violation of § 1343.  The

Chrisley Defendants do not contest that Defendant Julie Chrisley intentionally made misrepresentations by submitting falsified bank statements and a fake credit report to Jaret in support of her lease application for the California rental home.[12]   The evidence at trial showed that the City National Bank account belonging to 7C's Productions did not contain roughly $86,000, as Defendant Julie Chrisley represented in her application; rather, that account was overdrawn by approximately $14,000.   Compare id. at 1382:24–1383:3, with Trial Tr. Vol. 9 at 2241:1–8. Similarly, the BB&T account in which Defendant Julie Chrisley supposedly held over $419,000 was, contrary to her representation, completely empty.   Compare Trial Tr. Vol. 6 at 1380:10–1381:24, with Trial Tr. Vol. 9 at 2243:19–23.   Finally, Defendant Julie Chrisley did not have the excellent credit score she conveyed to Jaret in support of her lease application—instead, her credit score at the time was in the low 600s, which Jaret's own testimony conveyed would have been unacceptable. Compare Trial Tr. Vol. 6 at 1375:1–1382:18, with Trial Tr. Vol. 9 at 2244:24.

Despite the Chrisley Defendants' protestations, it is evident that Defendant Julie Chrisley made the above misrepresentations to influence Jaret's decision to recommend her as a rent-worthy applicant to his client, the California homeowner. [See Docs. 260 at 13; 295 at 10].   The Chrisley Defendants theorize that *only* the

---

[12] Similarly, the Chrisley Defendants do not dispute that Defendant Julie Chrisley made the above misrepresentations by using "wires" (that is, via email). See, e.g., Trial Tr. Vol. 9 at 2242:17–18.

California homeowner—not Jaret—could testify about what information was "material" to the decision regarding whether to lease the home to Defendant Julie Chrisley, but the Court disagrees with this contortion of the materiality standard. It is clear from Jaret's testimony that he was hired as a representative of the California homeowner for his expertise in real estate and to make recommendations to his client about which applicants to consider for a lease. See Trial Tr. Vol. 6 at 1370:22–1382:25. Jaret testified that "if the funds aren't there and the credit is not good, I would not recommend my client leasing the property" to that applicant. Id. at 1382:17–18. He further testified that he "absolutely" would have wanted to know the real amounts of available funds in the accounts provided by Defendant Julie Chrisley and that he also would have wanted to know that her credit score was more than 100 points lower than she represented. See id. at 1394:21–1395:22.

As stated above, a fact is material "if it has a natural tendency to influence, or is capable of influencing, the decision maker to whom it is addressed[.]" See Maxwell, 579 F.3d at 1299 (cleaned up). The Government presented sufficient evidence for the jury to conclude that Defendant Julie Chrisley "(1) intentionally participated in a scheme to defraud another of property or money and (2) used or caused the use of wires to execute the scheme to defraud." Franklin, 2022 WL 5337453, at *3. Accordingly, the Court denies the Chrisley Defendants' Rule 29 motion as to Count 7.

2.    <u>The Chrisley Defendants</u>

a.    *Counts 3, 5, and 6—Bank fraud*

The Chrisley Defendants contend that the Court should enter a judgment of acquittal on Counts 3, 5, and 6, which are the bank fraud charges related to GulfSouth Private Bank ("GulfSouth"), RBC Bank USA ("RBC"), and Wells Fargo, respectively.  [<u>See</u> Doc. 260 at 5–11].  Specifically, the Chrisley Defendants posit that no reasonable jury could have convicted them for defrauding these banks because the Government "offered no proof . . . that any alleged misrepresentation was material" to any "decision to provide [them] a loan."  [<u>See</u> <u>id.</u> at 10].  According to the Chrisley Defendants, the only evidence that would suffice to support verdicts against them on these Counts would have been testimony from employees of GulfSouth, RBC, and Wells Fargo regarding the Chrisley Defendants' misrepresentations and the impact of those misrepresentations on those banks' decisions to issue loans to the Chrisleys.  [<u>See</u> <u>id.</u> at 9–11].

In response, the Government argues that it "was [neither] required to call witnesses from the three financial institutions" involved in Counts 3, 5, and 6, nor "to offer evidence about the banking industry as a whole."  [<u>See</u> Doc. 289 at 13] (internal quotation marks and citation omitted).  Instead, the Government maintains that "[t]he jury could reasonably infer" that the false statements and misrepresentations by the Chrisley Defendants were material to the banks at issue

based on the testimony of the Chrisleys' co-conspirator, Braddock, and testimony from bankers from other institutions who received "the same types of false [financial] statements" from the Chrisleys "throughout the lengthy bank fraud conspiracy." [See id.]

As noted above, in the context of fraud, when a misrepresentation is made it is considered material where it "has a natural tendency to influence, or is capable of influencing, the decision maker to whom it is addressed." Maxwell, 579 F.3d at 1299 (cleaned up). Actual "reliance is not necessary to make the false statement material." United States v. Gregg, 179 F.3d 1312, 1315 (11th Cir. 1999) (internal citations omitted). "In other words, the statement need not have exerted actual influence, so long as it was intended to do so and had the capacity do so." Id. (internal citation omitted). Thus, for the evidence to be sufficient to sustain the Chrisley Defendants' convictions on these Counts, the Government was required to present evidence necessary for a reasonable trier of fact to find that the Chrisley Defendants made misrepresentations with the "natural tendency to influence" the banks' decisions to issue loans to them. Maxwell, 579 F.3d at 1299 (cleaned up).

Counts 3 and 6 charge the Chrisley Defendants with causing false personal financial statements to be transmitted to GulfSouth Private Bank and Wells Fargo, respectively. [See Doc. 130 at 10]. As briefly discussed above, Braddock created and submitted inflated PFS documents on behalf of the Chrisley Defendants to give

the appearance that their net worth was far greater than reality.  <u>See, e.g.</u>, Trial Tr. Vol. 6 at 1483:7–24, 1506:8–12.  As Braddock discussed with Defendant Julie Chrisley, the Chrisley Defendants needed "to keep showing the picture being good" on these PFS documents "so that [Defendant Todd Chrisley] could keep getting loans, otherwise, the world would kind of come crashing down." <u>See id.</u> at 1497:16–1498:9.  Braddock testified that Defendant Todd Chrisley was "primarily responsible for finding banks" to target as part of their scheme to "get new loans [to] . . . either pay off the old loans or keep the old loans current." <u>See id.</u> at 1493:4–12.

In furtherance of this scheme, Defendant Todd Chrisley and Braddock exchanged emails about how Braddock should tinker with the amount of loans the Chrisley Defendants owed to other banks "to make it look like" those "loan amounts were . . . less than" they were.  <u>See id.</u> at 1509:9–21.  Additionally, Braddock falsified securities investment portfolio summaries to make it appear as though the Chrisley Defendants owned assets they did not, to which Defendant Todd Chrisley responded: "You [Braddock] are a f***ing genius[.]"  <u>See id.</u> at 1514:19–24; <u>see also</u> Trial Tr. Vol. 8 at 1907:10–16 [Doc. 279].  Braddock testified that he "always copied [Defendant Todd Chrisley]" when he submitted a PFS on behalf of the Chrisley Defendants and that he and Todd Chrisley "had verbal conversations . . . about the personal financial statements" "all the time."  <u>See</u> Trial Tr. Vol. 6 at 1508:10–19.  Additionally, Braddock testified that he "often" created false financial

documents for the Chrisley Defendants by using cut-and-pasted material from other documents (such as an accountant's signature), which he and the Chrisley Defendants referred to as "scrapbooking." See id. at 1533:18–11.  Defendant Julie Chrisley "complimented [Braddock] on how well [he] could" create these "scrapbooked" documents "because when she [Julie Chrisley] tried to do it[,] it didn't line up, [or] it didn't make sense." See id. at 1534:8–9.

The PFS documents fabricated by Braddock were sent to GulfSouth and Wells Fargo. See id. at 1607:7–13.  Viewed in the light most favorable to the Government, the evidence at trial further showed that both Chrisley Defendants understood that Braddock submitted the falsified PFS documents to banks—including GulfSouth and Wells Fargo—with the express purpose of "obtaining loans or lines of credit" for the Chrisley Defendants.  See id. at 1471:20–1472:9.  When attempting to obtain "some new financing" from Wells Fargo, Defendant Todd Chrisley first had a verbal conversation with a bank representative about "his financial position," the details of which Braddock had to later confirm via email so that the PFS he was creating for Wells Fargo "would go along with" what Todd had said during the earlier conversation. See id. at 1504:6–15.  Braddock later copied Defendant Todd Chrisley on the email Braddock submitted to Wells Fargo with the false PFS, which inflated the Chrisley Defendants' assets by over $4 million.  See id. at 1505:10–1507:13.

Braddock also sent a fake PFS to GulfSouth on July 6, 2009, which he then forwarded to Defendant Todd Chrisley.  [See Doc. 263-244].

Count 5 charges the Chrisley Defendants with causing false audit paperwork to be transmitted to RBC.  [See Doc. 130 at 10].  As relevant here, the accountant for the Chrisley Defendants' company, Chrisley Asset Management ("CAM"), sometimes conducted audits of the company's finances.  See Trial Tr. Vol. 7 at 1686:16–20, 1867:13–1868:7 [Doc. 278].

In 2009, Defendant Todd Chrisley attempted to obtain a loan from RBC to purchase a property in Seaside, Florida.  [See Doc. 263-246].  When the vice president of RBC emailed Braddock to request corporate tax documents for CAM in support of the loan application, Braddock responded, copying Defendant Todd Chrisley, with a fictitious auditor's report that had *not* been prepared by CAM's accountant to "g[i]ve the appearance that the company was being audited regularly by a CPA."  See Trial Tr. Vol. 7 at 1867:20–1868:7.

While the Chrisleys may dispute Braddock's testimony, the Court must "resolve any conflicts in the evidence in the Government's favor."  Macko, 994 F.2d at 1528 (citing Burns, 597 F.2d at 941).  In so doing, the Court finds that it was reasonable for the jury to "find that the evidence establishes" the Chrisley Defendants' guilt regarding Counts 3, 5, and 6.  See Williams, 390 F.3d at 1323–24

(cleaned up) (quoting <u>Young</u>, 906 F.2d at 618).  Accordingly, the Court denies the Chrisley Defendants' Rule 29 motion as to these Counts.

> b.    *Count 8—Conspiracy to defraud the United States*

The Chrisley Defendants also challenge the sufficiency of the evidence underlying their conviction on Count 8 for conspiracy to defraud the United States (specifically, the IRS).  [<u>See</u> Doc. 260 at 20–24].  The gravamen of this charge is that the Chrisley Defendants used their company 7C's Productions to conceal Defendant Todd Chrisley's income from the IRS so that his tax debts could not be assessed and collected.  [<u>See</u> Doc. 130 at 14].  The Chrisley Defendants argue that the Government failed to present any evidence that they used 7C's Productions to conceal Defendant Todd Chrisley's income from the IRS.  [<u>See</u> Doc. 260 at 21–24].

To sustain a defendant's conviction of conspiracy to defraud the IRS pursuant to 18 U.S.C. § 371, the Government must prove: (1) the existence of an agreement with another to impede the functions of the IRS; (2) knowing and voluntary participation in that agreement; and (3) commission of an act in furtherance of the agreement.  <u>See</u> <u>Hough</u>, 803 F.3d at 1187; <u>see also</u> <u>United States v. Adkinson</u>, 158 F.3d 1147, 1153 (11th Cir. 1998).  "Participation in a conspiracy can be proved by direct or circumstantial evidence[.]"  <u>Gonzalez</u>, 810 F.2d at 1542 (citing <u>United States v. Cole</u>, 755 F.2d 748, 755 (11th Cir. 1985)).  The Court finds that the Government presented sufficient evidence at trial as to each of these three (3)

elements such that it was reasonable for the jury to convict the Chrisley Defendants on this Count.

First, viewing the evidence in the light most favorable to the Government, it was reasonable for the jury to find that the Chrisley Defendants and Defendant Tarantino entered into an agreement to impede the functions of the IRS by diverting Defendant Todd Chrisley's personal income from their television show into bank accounts owned by 7C's Productions (for which Defendant Julie Chrisley had sole signature authority at the time).[13]  See Trial Tr. Vol. 4 at 1010:2–3 [Doc. 275].  In the matter at bar, the evidence at trial showed that the Chrisley Defendants personally—not any of their other family members—earned a total of $6.2 million for the years 2013 through 2017, which passed through 7C's Productions.  See id. at 1049:16–1051:13.  The Government also presented evidence that Defendant Todd Chrisley held himself out as a "wage earner for 7C's Productions," even though he did not report to the IRS any of his income that came through 7C's Productions and he kept any so-called "wages" in bank accounts belonging to 7C's Productions (for which Defendant Julie Chrisley was the sole signatory) instead of in a personal bank account, where those earnings might have been traced back to him.  See Trial Tr. Vol. 3 at 645:4–7; Trial Tr. Vol. 4 at 1003:6–1011:18.  The Chrisley Defendants do

---

[13] In contrast, the Court notes that the Chrisley Defendants had payments for one of their daughter's participation in the television show sent directly to her "and not to 7C's [Productions.]"  See Trial Tr. Vol. 4 at 1011:7–9.

not rebut this evidence in their instant Rule 29 motion.  Additionally, during a February 2017 radio interview, Defendant Todd Chrisley boasted that he paid between $750,000 and $1 million per year in taxes to the IRS, and yet, he had not timely paid *any* taxes for tax years 2013, 2014, 2015, or 2016.  See Trial Tr. Vol. 4 at 1053:11–1055:3.  And, with the Chrisley Defendants' knowledge, Defendant Tarantino sent purported copies of the Chrisley Defendants' individual tax returns for 2014, 2015, and 2016 to a bank and to a Bentley automobile dealership, even though all Defendants knew these tax returns had not been timely filed with the IRS.[14]  See Trial Tr. Vol. 3 at 647:6–19, 829:24–832:21.  All of this evidence supports the Government's accusation that the Chrisley Defendants and Defendant Tarantino entered into an agreement to impede the functions of the IRS.  Though this evidence is circumstantial and not direct, that is of no consequence because "[a] complete detailed agreement is not necessary to convict persons of conspiracy." United States v. Elledge, 723 F.2d 864, 868 (11th Cir. 1984).

Second, the Government presented evidence from which a reasonable jury could infer that the Chrisley Defendants' participation in the scheme to defraud the IRS was knowing and voluntary.  The Chrisley Defendants were aware of their outstanding tax obligations, as demonstrated by the repeated notices they (and

---

[14] The Government additionally notes that Defendant Todd Chrisley failed to pay "hundreds of thousands of dollars for the 2009 tax year" and that Defendant Julie Chrisley failed to timely file her 2013 taxes (which showed that she owed the IRS over $440,000).  [See Doc. 289 at 17, 20]; see also Trial Tr. Vol. 3 at 649:10–14, 829:24–25.

Defendant Tarantino) received throughout the relevant time period, including one IRS publication called "Why do I have to pay my taxes?"  See Trial Tr. Vol. 3 at 643:11–14; see also id. at 641:5–10 (IRS agent testifying that she had three (3) to four (4) conversations directly with Defendant Tarantino about the Chrisley Defendants' unfiled taxes).

Third, the Court finds the Government presented sufficient evidence for a jury to reasonably find the Chrisley Defendants took affirmative actions in furtherance of the conspiracy.  When the Chrisley Defendants learned that the IRS was investigating bank accounts controlled by Defendant Julie Chrisley, potentially including the 7C's Productions corporate bank account, Defendant Julie Chrisley immediately transferred ownership of the 7C's Productions account away from herself to Defendant Todd Chrisley's mother.  See Trial Tr. Vol. 2 at 488:10–489:5, 499:1–15, 502:5–14, 507:9–18, 546:21–547:6; Trial Tr. Vol. 3 at 657:7–8. Additionally, after the Chrisley Defendants learned they were the subjects of an IRS investigation, Defendant Julie Chrisley opened a new 7C's Productions bank account with sole signature authority vested in the name of Defendant Todd Chrisley's mother, and thereafter, the Chrisley Defendants directed their income to that account exclusively.  See Trial Tr. Vol. 2 at 504:18–508:14; Trial Tr. Vol. 3 at 664:21–665:5.  Officer Carter testified that Defendant Todd Chrisley helped facilitate this subsequent diversion of payments away from the original 7C's

Productions account to the new account in his mother's name.  See Trial Tr. Vol. 2 at 504:18–508:14; Trial Tr. Vol. 3 at 658:21–659:9.  Specifically, Defendant Todd Chrisley represented to the entity that paid the Chrisley Defendants for endorsement deals to "[p]lease refrain from sending any deposits to the account you have on file as that account has been compromised.  We will be sending another new account number tomorrow[.]"  See Trial Tr. Vol. 3 at 658:21–659:9.

In short, the Court finds that the Government presented sufficient evidence for the jury to reasonably find the Chrisley Defendants guilty on Count 8. Accordingly, the Court denies the Chrisley Defendants' Rule 29 motion as to the same.

c.   *Count 9—Tax evasion*

Finally, the Chrisley Defendants challenge their conviction for tax evasion pursuant to 26 U.S.C. § 7201 (Count 9) because "no reasonable jury could find beyond a reasonable doubt that any of the conduct alleged in the superseding indictment affected Todd Chrisley's tax liability, ability to pay taxes, or that the Chrisleys made any false statement to an IRS official." [Doc. 260 at 14].  "To prove a violation of § 7201, the Government must demonstrate (1) willfulness, (2) the existence of a tax deficiency, and (3) an affirmative act constituting an evasion or attempted evasion of the tax."  United States v. Hesser, 800 F.3d 1310, 1323 (11th Cir. 2015) (citing United States v. Kaiser, 893 F.2d 1300, 1305 (11th Cir. 1990)).

By their instant motion, the Chrisley Defendants challenge the third prong: an affirmative act. [See Doc. 260 at 14–15].

"An affirmative act of attempted evasion may consist of 'any conduct, the likely effect of which would be to mislead' the Government or conceal funds to avoid payment of a valid tax deficiency." Hesser, 800 F.3d at 1323 (quoting United States v. Daniels, 617 F.2d 146, 1489 (5th Cir. 1980)). The affirmative acts charged in the Superseding Indictment related to Count 9 are: using a nominee business entity (7C's Productions) to conceal income, using nominee bank accounts to conceal income and pay expenses, and providing false information to IRS employees. [See Doc. 130 at 23]. "The Government had only to prove one of these several acts, which were alleged conjunctively in the indictment." Hesser, 800 F.3d at 1324 (citing United States v. Edwards, 777 F.2d 644, 650 (11th Cir. 1985)). And as the Court has observed herein, "it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." Williams, 390 F.3d at 1323–24 (cleaned up) (quoting Young, 906 F.2d at 618 (11th Cir. 1990)); accord Calderon, 127 F.3d at 1324 (same).

Even assuming that the jury credited the Chrisley Defendants' "alternative explanations" for the function and purpose of the bank accounts belonging to 7C's

Productions, the Court finds "there was [still] ample evidence from which a jury could have found that" the Chrisley Defendants used these accounts to conceal Defendant Todd Chrisley's income so as "to evade the payment of taxes." <u>See Hesser</u>, 800 F.3d at 1324. As detailed above, the evidence presented at trial showed that the Chrisley Defendants directed Defendant Todd Chrisley's income into "a nominee bank account" belonging to 7C's Productions. [<u>See</u> Doc. 289 at 23]. The Chrisley Defendants do not dispute that Defendant Todd Chrisley received his income, earnings, or wages from 7C's Productions and that he kept those funds in accounts belonging to 7C's Productions. The evidence at trial showed that Defendant Julie Chrisley took immediate action to transfer ownership of the 7C's Productions corporate account to Defendant Todd Chrisley's mother once they learned the IRS was investigating them and that an entirely new 7C's Productions bank account was opened by Defendant Julie Chrisley (in her mother-in-law's name) during the same time period.

It was reasonable for the jury to conclude that the Chrisley Defendants took these affirmative actions to conceal Defendant Todd Chrisley's income from the IRS to evade his tax liabilities, particularly given his failure to timely file tax returns for 2013 through 2016. At the very least, the evidence at trial (including the testimony of Officer Carter) showed the "*likely* effect of" the Chrisley Defendants' conduct was "to mislead the Government or conceal funds to avoid payment of a valid tax

**Case 1:19-cr-00297-ELR-JSA   Document 389   Filed 01/18/23   Page 78 of 78**

deficiency." <u>Hesser</u>, 800 F.3d at 1323 (emphasis added and internal quotation omitted). And if the Government showed the likely effect of the Chrisley Defendants' conduct was to mislead the Government or conceal funds to avoid paying taxes, it has met its burden to sustain the Chrisley Defendants' convictions for tax evasion. Accordingly, the Court denies the Chrisley Defendants' Rule 29 motion as to Count 9.

## IV.   Conclusion

For the foregoing reasons, the Court **ADHERES** to the rulings set forth in its October 28, 2022 Order [Doc. 300], wherein the Court denied the following motions: the Chrisley Defendants' "Joint Motion for New Trial" [Doc. 258], Defendant Tarantino's "Rule 33 Motion for a New Trial" [Doc. 259], and the Chrisley Defendants' "Joint Motion for Judgment of Acquittal" [Doc. 260]. Additionally, the Court **DENIES** the Chrisley Defendants' "Joint Motion for Reconsideration of Motion for New Trial and Motion for Sanctions." [Doc. 304].

**SO ORDERED**, this 18th day of January, 2023.

*Eleanor L. Ross*
_____
Eleanor L. Ross
United States District Judge
Northern District of Georgia